FIRST DIVISION
Filed: 7-16-07

No. 1-06-0287

| | | |
|---|---|---|
| In re ESTATE OF KARL T. LAMBRECHT, Deceased | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| | ) | |
| (Raymond Lambrecht, Independent Administrator of | ) | |
| the Estate of Karl T. Lambrecht, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 03 P 7718 |
| | ) | |
| v. | ) | |
| | ) | |
| Carl Lambrecht, | ) | Honorable |
| | ) | James W. Kennedy, |
| Respondent-Appellant.) | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

The deceased, Karl Lambrecht, held a one-third beneficial interest in real estate located at 4200-10 North Lincoln Avenue in Chicago (subject property). Three of his children held a collective two-thirds beneficial interest in the subject property. One of the three children was named the independent administrator of the deceased's estate. Upon petition, the trial court authorized the engagement of an appraiser for the purpose of selling the one-third interest in the property to the owners of the two-thirds interest for the appraised value of the one-third interest.

The independent administrator's appraiser reported a $1 million fair market value of the entire subject property. One of the heirs to the one-third beneficial interest in the subject property, Carl Lambrecht, objected to the valuation and presented another appraisal valuing the subject property at $1,500,000. After a bench trial, the trial court denied the objections, finding that the independent administrator's appraisal was fair.

No. 1-06-0287

Carl Lambrecht appeals arguing that the trial court's approval of the sale of the decedent's interest in the subject property based on the independent administrator's valuation was contrary to the manifest weight of the evidence. Specifically, Carl Lambrecht argues that the independent administrator's appraiser (1) improperly based the valuation on the value of the building located on the subject property without including a valuation of the land, (2) did not compare any sales in the area that involved tear-downs and redevelopment, and (3) improperly reduced the fee-simple valuation of the building by outstanding multiyear leases. We affirm.

BACKGROUND

On November 17, 2003, letters of office were issued naming Raymond Lambrecht the independent administrator of the estate of his deceased father, Karl T. Lambrecht. Karl died on January 22, 2001. At the time of his death, the only asset requiring probate in Karl's estate was an undivided one-third beneficial interest in a land trust. Karl's heirs included his surviving widow, Guadalupe Lambrecht (Karl's fourth wife), and Karl's seven children: Carl, Alvin, Raymond, Carolina, Pompeya, Anita Banas, and Elisabeth Aubrey Smith.

The subject property consisted of a mixed-use building, with commercial units occupying the ground floor and residential units occupying the second. Three of Karl's children, Raymond, Alvin, and Anita, each owned an undivided two-ninths interest in the subject property, for a collective two-thirds ownership.

2

On February 24, 2004, Raymond sent notice to all heirs of his petition to engage an appraiser for the purpose of selling his father's one-third interest in the subject property. The petition requested authority to engage an appraiser for the purpose of selling the one-third interest in the property to the owners of the two-thirds interest for the appraised value of the one-third interest.

On March 23, 2004, the trial court granted Raymond's petition authorizing him to "engage Brian D. Flanagan, MAI to appraise the subject property" and authorizing him "upon completion of and Petitioner's receipt of such appraisal to sell the 1/3 beneficial interest in [the subject property] for its appraised value to the owners of the other 2/3 beneficial interest ."

Carl Lambrecht, the objector, was present at the March 23, 2004 court hearing, posed no objection and initialed the order that was entered. No other heir objected to the procedure for determining the appraised value of the one-third interest in the subject property prior to the March 23, 2004, order's entry.

Brian Flanagan completed his appraisal and issued his report in which he concluded that as of May 12, 2004, the fee simple value of the subject property at its "highest and best use" was $1 million. Flanagan determined that the "highest and best use" of the subject property was in the property's current form. He determined that the value of the improved property with the existing building situated above the land was worth slightly more than the land itself.

In reaching his $1 million assessment, Flanagan utilized the "income capitalization" approach and the "sales comparison" approach, with an emphasis on the former. The "income capitalization" approach is defined in Flanagan's appraisal as:

"[A]n analysis of a property in terms of its ability to produce a net annual income. It is concerned with estimating the present worth of future benefits that can be derived through ownership of a property. In utilizing this approach, either stabilized net operating income is capatilized at an overall rate commensurate with the rate demanded by investors or a projected cash flow stream is discounted at an appropriate rate in order to arrive at an estimate of value. The Income Capitalization Approach is generally most useful in valuing an income producing property, which normally would be purchased by investors rather than by users."

Flanagan's appraisal also states:

"The Sales Comparison Approach is based on the assumption that a prudent buyer would not pay more for a property than it would cost to acquire a comparable substitute property. Since no two properties are ever identical, the necessary adjustments for differences in quality, location, size, market appeal, and a number of other factors that affect prices paid for properties must be made. The limitation of this approach is that the motives of the individual purchasers and sellers vary depending on their need for cash, their tax position, their personal preferences, available

4

financing, and a host of other factors that must be taken into consideration. As a result, it is often difficult to obtain sufficient information on a comparable sale to be able to make precise comparisons."

On December 8, 2004, each of the heirs, including Guadalupe, Elisabeth, Carolina, Pompeya and Carl, were served with the statutory notice form stating that the appraiser valued the subject property at $1 million and that the one-third interest in the property was sold to the two-thirds owners for $333,333.33. The notice also stated that if no objections were filed within 42 days, the estate of Karl Lambrecht would be closed and Raymond would be discharged as the independent administrator of the estate.

Carl filed objections to the subject property's valuation on January 19, 2004. Carl was allotted time to hire his own appraiser. Carl hired Ronald Becker, whom Carl had known for around five years. Becker was provided with a copy of the Flanagan appraisal prior to conducting his own appraisal.

Becker completed his appraisal and issued his report in which he concluded that as of April 2005, the fee simple value of the subject property at its "highest and best use" was $1,500,000. Becker determined that the "highest and best use" of the subject property was to raze the existing building and construct a new mixed-use building with space for commercial units on the ground floor and three stories of residential units above the commercial space.

In reaching his $1,500,000 assessment of the subject property, Becker utilized the "sales comparison" approach and the "income capitalization" approach with an emphasis

on the "sales comparison" approach to reach a "land value" assessment of the subject property. The Becker appraisal states:

"The *Sales Comparison Approach* results in an indicated value through analysis of sales and listings of properties with comparable amenities and utility to the appraised property. Differences between the comparative properties and the subject are first analyzed and quantified. These adjustments are applied to the sales prices, either on a lump sum basis or appropriate unit of comparison. The range in adjusted prices resulting from this analysis is then correlated to arrive at a value indication for the appraised property."

A trial was held due to the disparity between the two appraisals. The trial court heard the testimony of Raymond Lambrecht, Brian Flanagan and Ronald Becker, and considered various exhibits, including both appraisals. We summarize the testimony of the witnesses in pertinent part.

Raymond testified that he was the independent administrator of his father's estate. He testified that the decedent established the Karl Lambrecht Company, f/k/a Crystal Optics, in 1933 to produce optics. Raymond's mother, Karl's second wife, purchased the subject property in the 1970s. The Karl Lambrecht Company has been operating out of the subject property since then. Raymond's mother died in 1976, leaving a one-third interest in the subject property to Karl and a collective two-thirds interest to her children, Raymond, Alvin and Anita Banas. Raymond testified that the company has a lease with

the subject property and has been paying fair market rent since his mother died. He also testified that a not-for-profit movie theater and a Korean restaurant held leases and occupied other commercial space within the subject building. Raymond testified that all leases would terminate in 2009.

Brian Flanagan testified that he is a licensed appraiser and a member of the Appraisal Institute. Flanagan testified that his company has appraised hotels, commercial real estate, industrial buildings, shopping centers and vacant land. He testified that he works closely with banks, including MB Financial and Bridgeview Bank, both of which Flanagan testified are "extremely active" on the north side of Chicago. Flanagan estimated that he had looked at 150 buildings on the north side of Chicago in the year preceding the date of his appraisal of the subject property.

Flanagan testified that he had no prior relationship with either Raymond or Raymond's counsel prior to his appraisal of the subject property. He stated that he understood that he was to provide a fee simple appraisal of the subject property at its "highest and best use." Flanagan's report defines the highest and best use as "the reasonably probable and legal use of vacant land or improved property which is physically possible, appropriately supported, and financially feasible."

Flanagan testified that he decided that the "highest and best use" of the subject property on the date of his appraisal was in its current form and that he was aware of new construction in the areas to the north and south of the subject property, but that there was not as much new development activity in the immediate area. He based that assessment

7

on the fact that a Pay-4-Less gas station and a halfway house were located directly across the street from the subject property.

Since Flanagan determined that the "highest and best use" of the subject property was its current use, he used the "income capitalization" approach and the "sales comparison" approach to determine the fair market value of the building located on the subject property. Flanagan determined that the net income of the subject property was $74,079. He divided that figure by a capitalization rate of 7.5%, a rate that was utilized after consulting a national survey of real estate investments, to arrive at a fair market value of $987,719, which was rounded up to $1 million.

Under the "sales comparison" approach, Flanagan selected what he believed were comparable and contemporary sales of buildings in the area and made a "per unit" evaluation of each of the comparable buildings. Flanagan concluded that the per-unit price of the various properties was around $106,710. Flanagan multiplied the per-unit price by the 10 units contained in the building located on the subject property, which in turn was rounded off to $1 million.

Ronald Becker testified that he knew the objector, Carl Lambrecht, for five years. In February or March of 2005 Carl approached Becker about the pending litigation. Rather than simply reviewing the Flanagan appraisal, Carl and Becker decided that Becker would conduct an independent appraisal.

Becker stated that he has been an appraiser for more than 45 years and is also a member of the Appraisal Institute. Becker stated that he could recall doing one appraisal

8

in the general area of the subject property approximately two years prior to his testimony in the instant case. He estimated that he appraised about 10 to 15 properties in the area over the last 10 years.

Becker believed the "highest and best use" of the subject property was to redevelop it as a new commercial and residential property. To conduct his appraisal, Becker utilized a "sales comparison" approach to conduct a "land value" analysis of the subject property. Rather than utilizing a "per unit" analysis like Flanagan, Becker utilized a "square foot" analysis.

Under this approach, Becker made comparisons of recent sales of buildings in the area that he believed were comparable to the subject property. He also stated that in comparing these properties to the subject property he assigned an "adjusted price" that accounted for the difference in time of sale, location, and size of the comparable properties. He stated that he adjusted the sale price of the first property he compared to the subject property up 25%, and the second property up 13%, to arrive at his estimated per-square-foot value of the subject property's land. Becker also testified that he assigned a fixed percentage of 5% per year of an upward adjustment to account for the difference between the date of sale of the comparable properties and the appraisal date of the subject property. Based on Becker's calculations, the land value of the subject property was $123 per square foot.

Of the 11 properties compared to the subject property by Becker, all but one were adjusted upwards. Becker testified that if no upward adjustments but the 5% per year

9

adjustment were utilized, the per-square-foot value of the land would be $89, which would give the subject property a fair market value of $1,075,000.

On October 28, 2005, the trial court denied Carl's objections, stating that the Flanagan appraisal was "a valid, fair appraisal in accordance with the order I signed on 3/23/04." The trial court also rejected Carl's argument that Raymond breached his fiduciary duties. The trial court denied Carl's motion to reconsider after hearing argument from both parties. This timely appeal followed.

ANALYSIS

On appeal, Carl Lambrecht argues that the trial court's finding that the independent administrator's appraisal was "a valid, fair appraisal" of the fair market value of the subject property was against the manifest weight of the evidence. We disagree.

"An appellate court will defer to the judgment of the trial court regarding property valuation unless the trial court's decision was against the manifest weight of the evidence." *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1153 (2004). Furthermore, "[i]n a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact." *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991). "[A] reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact." *In re Application of the County Treasurer*, 131 Ill. 2d 541, 549 (1989). "The trial judge, as the trier of fact, is in a position superior to a court of

review to observe the demeanor of witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive." *Application of the County Treasurer*, 131 Ill. 2d at 549. Therefore, "where the testimony is conflicting in a bench trial, the [trial] court's findings will not be disturbed unless they are against the manifest weight of the evidence." *Application of County Treasurer*, 131 Ill. 2d at 549.

Here, the independent administrator and the objector brought competing testimony to establish the subject property's fair market value for the purpose of appraising and selling the one-third beneficial interest in the land trust to the owners of the two-thirds beneficial interest. The objector attacks the methodology used by the independent administrator's appraiser, Brian Flanagan, to arrive at his appraisal, in arguing that the trial court erred by relying on the independent administrator's expert in establishing the value of the property.

Flanagan based his appraisal on the fair market value of the building situated on the subject property after he determined that the "highest and best use" of the subject property was in its current form. Flanagan testified that he was aware of new construction in the areas to the north and south of the subject property, but that there was not as much development activity in the immediate area. He based that assessment on the fact that a Pay-4-Less gas station and a halfway house were located directly across the street from the subject property. After Flanagan determined that the "highest and best use" of the subject property was in it current form, he used the "income capitalization"

approach and the "sales comparison" approach to determine the fair market value of the subject property.

Although the objector does not specifically attack Flanagan's qualifications and experience, a review of Flanagan's qualifications and experience is pertinent to the trial court's finding that Flanagan's appraisal was valid and fair. Flanagan is a licensed appraiser and a member of the Appraisal Institute. His company has appraised hotels, commercial real estate, industrial buildings, shopping centers and vacant land. He works closely with banks that are "extremely active" on the north side of Chicago, where the subject property is situated. He testified that he had looked at about 150 buildings on the north side of Chicago in the year preceding the date of the instant appraisal.

Objector's expert, Ronald Becker, on the other hand, determined that the "highest and best use" of the subject property was to raze the existing building and redevelop it as a new commercial and residential property. To conduct his appraisal, Becker utilized a "sales comparison" approach to conduct a "land value" analysis. He compared sales of several buildings in the area that he believed were comparable to the subject property. In comparing these properties to the subject property, he assigned an "adjusted price" that accounted for the difference in time of sale, location, and size of the comparable properties. Of the 11 properties compared to the subject property, all but one were adjusted upwards. On cross-examination, Becker testified that if no upward adjustments were utilized, the fair market value of the land would be $1,075,000 as of the date of the Flanagan appraisal.

Becker stated that he has been an appraiser for more than 45 years and is also a member of the Appraisal Institute. He could recall doing only one appraisal in the general area of the subject property approximately two years prior to his testimony in the instant case. He estimated that he appraised about 10 to 15 properties in the area over the last 10 years. He also testified that he had known the Objector, Carl Lambrecht, for around five years.

The trial court found that the Flanagan appraisal was "a valid, fair appraisal" in accordance with the order to engage an appraiser for the purpose of selling the one-third interest to the owners of the two-thirds interest of the subject property. In making its finding the trial court inherently found Flanagan's testimony to be more credible. In our view, the trial court's finding that Flanagan's testimony was more credible than Becker's testimony was not against the manifest weight of the evidence, especially in light of the fact that Becker had known Carl Lambrecht for five years prior to his appraisal, and Carl had expressed dissatisfaction with the Flanagan appraisal and provided that appraisal to Becker.

Despite the foregoing, the objector argues that the administrator's appraisal was flawed because the appraiser ignored the sales of newly constructed commercial and residential buildings in the area.

In cases involving the appraisal of property, appraisers have wide discretion with respect to the methods and procedures they follow in determining value. *Board of Education of the City of Chicago v. Gorenstein*, 179 Ill. App. 3d 388, 394 (1989). As

long as the appraisers act honestly and in good faith, they have wide discretion with respect to their methods of procedure and the sources of information they use to arrive at the value they assign. *General Casualty Co. v. Tracer Industries, Inc.*, 285 Ill. App. 3d 418, 420-21 (1996). "The mere fact that one or more parties to an appraisal disavows or bewails its results does not invalidate or nullify the good-faith conclusions of the appraiser." *Superior Investment & Development Corp. v. Devine*, 244 Ill. App. 3d 759, 771 (1993).

The objector argues that the record establishes that Flanagan ignored the value of the land in conducting his appraisal. Specifically, the objector argues that the following colloquy demonstrates that Flanagan did not conduct a proper appraisal:

"Q. What if someone were to raze the Subject Property down to dirt, construct a four-story building with modern construction methods, the first floor of this new building being commercial units and the top three stories being upscale residential units sold as condominiums, do you think that would be a higher and better use of the Subject Property than it is?

A. Yes."

To the contrary, the record establishes that the Flanagan appraisal did not ignore the value of the land. Flanagan testified that he did not do a "land value" appraisal, only after he determined that the value of the existing building exceeded the value of the land. Flanagan testified:

14

"I looked at land values in the area. I made a determination in my *** professionally [*sic*] opinion that the land value was less than the building value. They might have been similar, but I thought on a marginal basis the building as it stood that day had a greater value than the land. And that's how I came to my opinion."

Later in his testimony, Flanagan stated:

"[O]n that day when I looked at [the subject property on] May 12, 2004, *** I thought that the building was marginally more *** was worth more marginally than the land and that is how I appraised my highest and best use *** . I know the trends in land in the area. I'm vastly experienced on the north side of Chicago in terms of development and *** how much land and what developers are thinking. And when I determine what this building is worth, I'm not saying that it was, that never in the future it wouldn't be a great site for development. I'm saying that at that point in time, I thought that the building as it exists was marginally greater than the land."

Upon making his determination that the value of the building was greater than the value of the land, Flanagan utilized the "income capitalization" approach and the "sales comparison" approach to appraise the subject property. In conducting his "sales comparison" approach, Flanagan selected what he believed were comparable and contemporary sales of buildings in the area and made a "per unit" evaluation of each in

reaching his appraisal of about $1 million for the subject property. In light of the foregoing, we find the objector's argument that Flanagan ignored the value of the land in making his appraisal unpersuasive.

Finally, the objector argues that Brian Flanagan improperly considered the effect of the long-term leases held by the Karl Lambrecht Company, the Korean restaurant, and the not-for-profit movie theater in appraising the subject property. The Flanagan appraisal states:

"The purpose of this appraisal is to estimate the value of the 'as is' fee simple interest in the subject property as of May 12, 2004. The function of the appraisal is to estimate the value of the subject property as collateral for financing purposes. Fee simple interest is defined *** as: Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the government powers of taxation, eminent domain, police power, and escheat."

The record establishes that Flanagan conducted the appraisal to the standards indicated in his appraisal report. Although there is testimony discussing the effect long-term leases have on a developer's decision to buy land to redevelop, nothing in the appraisal report indicates that the long-term leases played any role in decreasing Flanagan's assessment of the value of the subject property. To the contrary, Flanagan's testimony establishes that the appraisal was conducted without consideration given to the long-term leases. The following testimony is pertinent:

"Q. How did you approach this appraisal?

A. Well, it was my understanding that it was part of an estate and *** the instructions were can you give us a market value appraisal of this property. You know, I went out and I said, well, there are leases here. Let's not confuse the situation. Let's appraise it fee simple. The leases appear to be market.

I looked at the tax returns for the previous period of time, so I had an idea of what level of income they had. There's an owner-occupant, I thought at the time, the Lambrecht Company, that had been there for a long time. They occupied the – you know, part of the building, pretty much the back and a part of the front. So I assigned *** what I thought was a market rent for all the spaces and a fee-simple environment based on what was already in place for this building for the type of building it is."

In light of the foregoing, we find the objector's argument unpersuasive.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County. We find that the trial court's finding that the Flanagan appraisal was valid and fair was not against the manifest weight of the evidence. We also find that the Flanagan appraisal did not ignore the value of the land when appraising the fair market value of the

subject property and that Flanagan did not improperly consider the effect of the long-term leases on the value of the subject property.

Affirmed.

CAHILL, J. and GARCIA, J., concur.