NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190160-U

NO. 4-19-0160

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 3, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| REY JANNUSCH, | ) | Appeal from |
|     Counterplaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | McLean County |
| JOHN D. REHTMEYER, | ) | No. 12CH235 |
|     Counterdefendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Paul G. Lawrence, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding the trial court did not err in (1) valuing
the parcels awarded to counterdefendant or (2) partitioning the property.

¶ 2     This appeal arises from a partition action wherein counterplaintiff, Rey Jannusch,

and counterdefendant, John D. Rehtmeyer, sought to partition their respective interests in a piece

of property referred to as the "Grove."  In May 2018, the trial court entered an order partitioning

the property.  Counterplaintiff appeals, arguing the trial court erred by (1) determining the value

of two one-acre parcels without competent evidence, (2) not ordering a judicial sale of the Grove

after determining the property could not be partitioned without manifest prejudice to the parties,

(3) determining the boundary of one one-acre parcel contained certain structures, and

(4)  partitioning the Grove in a way that was manifestly prejudicial to counterplaintiff.  For the

following reasons, we affirm the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4         In 2008, the parties' mother passed away and the four siblings—counterplaintiff,

counterdefendant, Sarah Quinton, and Curtis Rehtmeyer—each became owners of an undivided

one-fourth interest of real property.  The map below depicts the structures located in the Grove,

including (A) the Deerwester house at 8042 E. 550 N. Road, (B) the Campbell house at 5509

Maple Lane, (C) an antique store, (D) a railroad depot, (E) a township shed, and (F) grain bins.



¶ 5        The siblings negotiated to separate their interests in the property.  As part of these efforts, the siblings entered into an agreement in March 2011.  In part, the agreement stated counterdefendant would receive two one-acre areas around the Deerwester and Campbell houses.  The final line of the March 2011 agreement stated, "Said above real estate shall be valued and deducted equally against the value of any real estate received by Sarah Quinton and [counterplaintiff]."  In May 2012, the siblings entered into another agreement, whereby Curtis Rehtmeyer severed his interest in the Grove.

¶ 6        In June 2012, Quinton filed a complaint for partition of the property she owned as tenants in common with counterplaintiff and counterdefendant.  Quinton subsequently conveyed her interest to counterplaintiff, leaving counterplaintiff with a two-thirds interest in the Grove.  Quinton was dismissed from the partition action and counterplaintiff filed a counterclaim for partition to continue this case.

¶ 7        In July 2016, the trial court entered an order determining the March 2011 agreement was enforceable and stated "[counterdefendant] is granted ownership of [two] [one]-acre parcels known as 8042 E. 550N Road and 5509 Maple Lane in 'The Grove' under the residences he currently owns."  In August 2016, the court clarified it made no ruling as to the specific dimensions of the one-acre parcels or the ownership of the two residences.  The court further ruled the last sentence of the March 2011 agreement—"Said above real estate shall be valued and deducted equally against the value of any real estate received by Sarah Quinton and [counterplaintiff]"—was ambiguous and continued the matter for further litigation.

¶ 8                                      A. Stipulations

¶ 9        In July 2017, the parties stipulated that counterplaintiff waived any right to appeal the trial court's ruling that counterdefendant owned two one-acre parcels surrounding the

residential structures known as 8042 E. 550 N. Road and 5509 Maple Lane. Counterplaintiff additionally stipulated the March 2011 agreement was enforceable. The parties stipulated counterdefendant "conveyed to [counterplaintiff] any and all interest he possesses in the real estate, with any improvements thereon," the 0.61-acre lot where the antique store sat as part of her two-thirds interest in the Grove. Further, the parties stipulated it remained a question under the March 2011 agreement whether counterdefendant was entitled to the two one-acre parcels as part of his one-third interest in the Grove or in addition to his one-third interest. Finally, the parties stipulated counterdefendant would (1) "receive clear title to the structure commonly known as 8042 E. 550 N.Rd., McLean, Illinois and a One-Acre parcel of land surrounding the structure," and (2) "receive clear title to the structure commonly known as 5509 Maple Lane, McLean, Illinois and a One-Acre [p]arcel of land surrounding the structure." However, the parties disputed the boundaries of the one-acre parcels and the stipulation specifically stated the boundaries and the value of the one-acre parcels were subject to further order of the trial court.

¶ 10        In August 2017, the parties filed another stipulation as to the testimony of W. Bradley Park and David A. Park, certified appraisers retained to appraise the value of the Grove. Regardless of the configuration of the one-acre lots, the one-acre lot and Deerwester house had a value of $47,000, and the one-acre lot and Campbell house had a value of $52,000. The remaining 8.54 acres of the Grove had a value of $84,000. The parties jointly offered the written appraisal into evidence at trial. The appraisal of the two one-acre lots took the value of the residential structures into account. The appraisal of the remaining property did not consider the value of any structures and determined the property had a value of $12,000 per acre.

¶ 11        The parties further stipulated the director of the McLean County Department of Building and Zoning would testify that portions of the Grove were zoned for commercial and

residential use. The Grove could be re-zoned to create two parcels around the Deerwester and Campbell houses with the remainder constituting a third parcel. Alternatively, the remainder could be divided into two separate parcels.

¶ 12　　　　Finally, the parties stipulated that an engineer for the McLean County Highway Department inspected the Grove and would testify that the property currently had two entrances to the county highway. The first entrance was located at Maple Lane near the railroad tracks. The second entrance was located between the township shed and the railroad depot. The second entrance included a parking area for the antique store located across the county highway. The county highway department would allow the second entrance to be moved closer to the Deerwester house but would not permit a third entrance to be added.

¶ 13　　　　　　　　　　　　　　B. Trial

¶ 14　　　　In August 2017, the matter proceeded to trial, where the trial court heard the following relevant evidence.

¶ 15　　　　　　　　　　　　　1. *William Wetzel*

¶ 16　　　　William Wetzel testified he was appointed commissioner of the partition action shortly after the case was filed. Wetzel opined the Grove could not be equitably divided without manifest prejudice to the parties. According to Wetzel, the parties had conflicting interests in the structures in the Grove and there were two sets of zoning regulations in effect. Specifically, Wetzel could not determine a fair partition regarding the one-acre lots around the Deerwester and Campbell residences. When he determined his inability to avoid manifest prejudice in partitioning the property, Wetzel lacked the benefit of the 2017 stipulations. Wetzel agreed that if the position of the parties had changed since he formed his opinion, that would make a

difference in whether or not the property could be partitioned without manifest prejudice to the parties.

¶ 17                                   2. *Rick Jannusch*

¶ 18          Rick Jannusch testified he was married to counterplaintiff who owned a two-thirds interest in the Grove. Jannusch opined an equitable division was impossible because the parties could not reach an agreement. For the division to be equitable to counterplaintiff, Jannusch testified, "She's always owned the railroad depot, so she certainly would need to receive that. And the township shed is across from the antique store and she purchased Sarah Quinton's ownership of Sarah's interest in [t]he Grove, including the township shed. So those two buildings are very important and the land they are located on is very important." Counterplaintiff would also need to receive compensation for two-thirds of the overall value of the Grove. Jannusch testified that, based on the appraisals, counterdefendant would receive more than his one-third interest if he received the two one-acre lots. According to Jannusch, if counterdefendant received his proposed one-acre lots, he would be required to reimburse counterplaintiff $26,000.

¶ 19          Jannusch identified counterplaintiff's exhibit No. 17 as a plat of the Grove with proposed one-acre lots around the Deerwester and Campbell houses (reproduced above). According to Jannusch, the proposed lots were unacceptable because the lot around the Deerwester house contained the railroad station that counterplaintiff owned. Additionally, Jannusch testified, "this drawing excludes all the right of way in gray south of the one-acre lots around the Deerwester's house. It's common knowledge that right of way goes with a parcel that a person owns, and so to exclude that wouldn't be fair. That needs to be included in the one-acre lot." Jannusch acknowledged it was possible, but not preferable, to move the railroad depot.

- 6 -

Jannusch testified, "The antique store and the railroad station are prominent features on the Route 66 tour. And they have become a fixture in Funks Grove. The location of the railroad depot is very important. People stop all the time, take photos at the railroad station *** [and] the antique store."

¶ 20        Jannusch identified counterplaintiff's exhibit No. 13 as a map with proposed one-acre lots that included more of the right of way land and excluded the land under and around the train depot. Counterplaintiff's exhibit No. 18 showed a map with proposed changes to remove the driveway shared by the railroad depot and the Deerwester house that would accommodate the lots as depicted in counterplaintiff's exhibit No. 13.

¶ 21        According to Jannusch, the family had a tradition "that some of the structures are owned by people that do not necessarily own the land underneath." Counterplaintiff separately owned the railroad depot. Counterplaintiff's father poured the concrete pad the railroad depot sits on and moved the depot to its present location in 1972. According to Jannusch, there was sentimental value to the railroad depot's location.

¶ 22        Jannusch testified he signed the March 2011 agreement and understood it to mean counterdefendant would receive the two-acre parcels as part of his one-third interest in the Grove and not in addition to his one-third interest. As part of the agreement, Jannusch received the right to farm certain acreage and he would not have done so if the two-acre parcels were in addition to counterdefendant's one-third interest in the Grove.

¶ 23                                3. *Counterplaintiff*

¶ 24        Counterplaintiff testified she worried the Grove could not be equitably divided but a judicial sale was not her preference. To be satisfied with an equitable partition of the Grove, counterplaintiff required her two-thirds share to include the land with the antique store,

the railroad depot, and the township shed. Counterplaintiff's testimony was consistent with Jannusch's testimony regarding the disputes over the partition. Counterplaintiff testified moving the railroad depot was impractical based on expense and lack of room to move the depot. According to counterplaintiff, the grain bins were another problem because they were "back away from both of the residences and they need[ed] to go with one or the other house, or be removed." Although not an impossibility, counterplaintiff did not want the grain bins removed.

¶ 25　　　　Counterplaintiff testified she purchased the township shed from her sister and "it had a lot of history for the area." According to counterplaintiff, the township shed was part of a historical tourist attraction. Counterplaintiff acknowledged the area was not a designated historical site. Counterplaintiff agreed the railroad depot would retain its historical significance if it were moved. When asked about the concrete slab on which the depot sat, counterplaintiff testified, "It has a lot of memories. And I am not necessarily hung up on the concrete slab, but it does have a lot of memories. And if we could figure out how to move the concrete slab along with the depot and not us pay for that, then I will go with that."

¶ 26　　　　　　　　　　　　*4. Counterdefendant*

¶ 27　　　　Counterdefendant testified he referred to the Deerwester house as "8042 E." According to counterdefendant, sharing a driveway with the railroad depot was difficult because access to the property was key. Counterdefendant was aware of the proposed relocation of a driveway for the Deerwester house, but testified it was implausible because the proposed driveway would cross the septic line from the house. Counterdefendant objected to redrawing the one-acre parcel surrounding the Deerwester house so it excluded the railroad depot. According to counterdefendant, redrawing the proposed lot posed numerous problems, including the septic system, the well for the property, and the driveway. The Deerwester property was

zoned commercial and the driveway accessed a public road, providing visibility and easy access to the commercial lot.

¶ 28          Counterdefendant testified he received five acres from his parents in 1980. In 1981, counterdefendant received an additional 35 acres from his parents. According to counterdefendant, he built a home which did not sit on the five acres his father gave him, so counterdefendant requested an additional two acres so his home would sit on the five acres. Counterdefendant testified his parents instead gave him 35 acres.

¶ 29          If the court determined his proposed one-acre lot around the Deerwester house was appropriate, his first choice would be to move the railroad depot. However, counterdefendant would be willing to enter a lifetime lease with counterplaintiff that would encompass the railroad depot and the township shed. Counterdefendant acknowledged this would require the parties to share the driveway.

¶ 30                              5. *Sarah Quinton*

¶ 31          Quinton testified she understood the March 2011 agreement allowed counterdefendant to receive the two one-acre parcels and she and counterplaintiff would be compensated with additional property elsewhere. Quinton testified the two one-acre parcels constituted part of counterdefendant's one-third share of the Grove.

¶ 32                              6. *David Armstrong*

¶ 33          David Armstrong testified he represented the Rehtmeyer family limited partnership. In February 2011, the siblings' father passed away and Armstrong worked to distribute the real estate the siblings held as tenants in common. According to Armstrong, the March 2011 agreement arose from the siblings' desire to dissolve the limited family partnership and distribute the real estate. Armstrong testified the Rehtmeyer parents gave Quinton, Curtis,

and counterplaintiff parcels of land that contained a house for them to live in. All three transfers came from the family limited partnership. Only counterdefendant had not received such a gift from his parents. As to the March 2011 agreement, Armstrong stated, "Well because [counterdefendant] was the only one who had never received any houses from his parents. And so everybody agreed that since he had given up interest in the [family limited partnership] for the other three siblings, that [counterdefendant] should get his acres that he did not receive during his parents' life now." The final sentence of the March 2011 agreement "was drafted because [counterdefendant] was to receive land, because he had given up land out of the [family limited partnership] to Sarah and [counterplaintiff.] So [counterdefendant] was to get the value of the land deducted from the portion that [counterplaintiff] and Sarah were to receive."

¶ 34        Armstrong testified the March 2011 agreement was written in terms of value rather than acreage because there were approximately 1500 acres of farmland to divide. Offsetting acres rather than value was problematic because not all the property had the same value. All the property had been appraised and all the property other than the Grove had been divided equally within $100 in value. The total value of the other land not including the Grove was valued between $11 or $12 million. Armstrong testified that the March 2011 agreement was not intended to provide that counterplaintiff and Quinton would be compensated for counterdefendant receiving the two one-acre lots in the Grove.

¶ 35                        C. Trial Court's Ruling

¶ 36        In May 2018, the trial court entered a written order finding the two one-acre lots constituted a portion of counterdefendant's one-third interest in the Grove. The court noted the parties stipulated that counterplaintiff waived any right to appeal the court's previous ruling that counterdefendant owned two one-acre parcels around the Deerwester and Campbell houses. The

- 10 -

parties further stipulated that counterdefendant would receive clear title to the structure commonly known as 8042 E. 550 North Road, 5509 Maple Lane, and the one acre parcels of land surrounding each structure. In determining the boundaries of the one-acre parcels, the court wrote as follows:

> "The [c]ourt finds that it is very difficult to divide the premises without prejudice to the owners, however, Judge Foley's earlier ruling that awarded the residence and one acre parcels surrounding them to [counterdefendant] and the subsequent stipulation of the parties, would require the [c]ourt to ignore the prior order and stipulation if the [c]ourt ordered a sale. Therefore, the [c]ourt will divide the premises in question as opposed to ordering a sale of them."

The court agreed with Wetzel's testimony that he could not recommend a partition that would divide the property without manifest prejudice; however, the court concluded the parties' stipulation that counterdefendant would receive the two one-acre parcels prevented a judicial sale.

¶ 37    The trial court awarded counterdefendant one-acre lots drawn as proposed by counterdefendant, finding there was no practical way to exclude the depot from the one-acre lot and still provide reasonable access to the public road. The court noted the one-acre parcel contained the railroad depot and gave counterplaintiff the option of either moving the depot or entering a lifetime lease of the premises including the depot and the township shed. The court adopted counterdefendant's exhibit No. 18 and awarded a portion of the Grove where the Deerwester and Campbell houses stood to counterdefendant and awarded the remainder to

- 11 -

counterplaintiff. The court further adopted counterdefendant's exhibit No. 16, which considered that the two one-acre parcels constituted a portion of counterdefendant's one-third interest in the Grove. The court wrote, "[counterplaintiff] would receive land totaling $60,000 and [counterdefendant] would receive land totaling $48,000, so [counterdefendant] shall reimburse [counterplaintiff] $6,000 so that each would receive land worth $54,000."

¶ 38       In February 2019, the trial court amended its order following posttrial motions. The court noted the stipulations required counterdefendant receive the two one-acre parcels and awarded counterplaintiff two-thirds of the remainder of the Grove. The court adopted the same property line contained in the first order. The court further ordered counterplaintiff would receive land worth $60,000 and counterdefendant would receive land worth $48,000.

¶ 39       This appeal followed.

¶ 40                              II. ANALYSIS

¶ 41       On appeal, counterplaintiff argues the trial court erred by (1) determining the value of two one-acre parcels without competent evidence, (2) not ordering a judicial sale of the Grove after determining the property could not be partitioned without manifest prejudice to the parties, (3) determining the boundary of one one-acre parcel contained certain structures, and (4) partitioning the Grove in a way that was manifestly prejudicial to counterplaintiff.

¶ 42       An action for partition is equitable in nature. *Rothert v. Rothert*, 109 Ill. App. 3d 911, 916, 441 N.E.2d 179, 182 (1982). "[T]he reason for partition is to enable those who own property in common to sever their interests so that one may take possession of and enjoy and improve his separate estate at his own pleasure and convenience." *Stegeman v. Smith*, 67 Ill. App. 2d 451, 457, 214 N.E.2d 597, 601 (1966). In pertinent part, the Partition Act provides as follows:

- 12 -

"After entry of judgment adjudicating the rights, titles, and interests of the parties, the court upon further hearing shall determine whether or not the premises or any part thereof can be divided among the parties without manifest prejudice to the parties in interest. If the court finds that a division can be made, then the court shall enter further judgment fairly and impartially dividing the premises among the parties with or without owelty. If the court finds that the whole or any part of the premises sought to be partitioned cannot be divided without manifest prejudice to the owners thereof, then the court shall order the premises not susceptible of division to be sold at public sale in such manner and upon such terms and notice of sale as the court directs." 735 ILCS 5/17-105 (West 2018).

The right to partition does not yield to any hardship, inconvenience, or difficulty. *Rosenbaum v. Rosenbaum*, 38 Ill. App. 3d 1, 15, 349 N.E.2d 73, 83 (1976). "The law favors a division of land in kind, rather than a division of proceeds from a sale of the land and, therefore, an unequal division with owelty is preferred over a sale of the premises." *Rothert*, 109 Ill. App. 3d at 916.

¶ 43                                    A. Standard of Review

¶ 44        Counterplaintiff contends this court should review the trial court's judgment *de novo* where the evidence was submitted through written stipulations and jointly offered documentary exhibits. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 28, 47 N.E.3d 252. Counterdefendant disagrees and argues this court must determine whether the trial court's judgment was against the manifest weight of the evidence. *Silas v. Robinson*, 131 Ill. App. 3d

1058, 1061, 477 N.E.2d 4, 6-7 (1985) (holding that partition actions are reviewed under a manifest weight of the evidence standard).

¶ 45          Ordinarily, this court would determine whether the trial court's determination of value was against the manifest weight of the evidence. *In re Estate of Lambrecht*, 375 Ill. App. 3d 865, 871, 874 N.E.2d 170, 175-76 (2007). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Zion M.*, 2015 IL App (1st) 151119, ¶ 27. Because the trial court is in the best position to observe the witnesses, assess credibility, and weigh the evidence, the trial court is vested with wide discretion. *Id.*

¶ 46          When a finding is based solely on stipulations or documentary evidence, the trial court is not in a better position than the reviewing court to assess credibility or weigh the evidence. *Id.* ¶ 28. In such circumstances, we review a trial court's decision *de novo*. *Id.*

¶ 47          We note counterplaintiff cites numerous cases regarding review of a trial court's decision on a motion to reconsider (735 ILCS 5/2-1203 (West 2018)). However, counterplaintiff fails to raise any contentions of error related to the court's denial of her motion to reconsider. Accordingly, we discuss the standards of review applicable to the claims she raises.

¶ 48                              B. Value of One-Acre Parcels

¶ 49          Counterplaintiff first contends the trial court's valuation of the two one-acre lots was unsupported by the stipulated evidence. As such, counterplaintiff contends our review of this issue is *de novo*.

¶ 50          As counterdefendant correctly points out, the trial court did not base its decision solely on stipulations or documentary evidence. The trial court held a two-day bench trial during which it heard from numerous witnesses regarding the issues. While it may be true the parties stipulated to the admission of the appraisal report for the Grove, they did not stipulate to the

value of the one-acre lots. Moreover, the trial court's finding of the value of the one-acre lots makes sense considering the evidence heard during trial. Accordingly, we must determine whether the trial court's finding of the value of the one-acre lots was against the manifest weight of the evidence. *Lambrecht*, 375 Ill. App. 3d at 871.

¶ 51        Counterplaintiff argues the trial court ignored the appraisal the parties stipulated to admit into evidence. The appraisal determined that, regardless of the configuration of the one-acre lots, the one-acre lot and Deerwester house had a value of $47,000, and the one-acre lot and Campbell house had a value of $52,000. The remaining property in the Grove had a value of $84,000. The appraisal of the two one-acre lots took the value of the residential structures into account. The appraisal of the remaining property did not consider the value of any structures and determined the property had a value of $12,000 per acre.

¶ 52        The parties further stipulated counterdefendant "conveyed to [counterplaintiff] any and all interest he possesses in the real estate, with any improvements thereon," the 0.61-acre lot where the antique store sat as part of her two-thirds interest in the Grove. The parties stipulated counterdefendant would (1) "receive clear title to the structure commonly known as 8042 E. 550 N.Rd., McLean, Illinois and a One-Acre parcel of land surrounding the structure," and (2) "receive clear title to the structure commonly known as 5509 Maple Lane, McLean, Illinois and a One-Acre [p]arcel of land surrounding the structure." However, the parties disputed the boundaries of the one-acre parcels and the stipulation specifically stated the boundaries and the value of the one-acre parcels were subject to further order of the trial court.

¶ 53        Read together, these stipulations make clear the parties did not stipulate to the value of the one-acre lots. The appraisal itself indicated that, regardless of configuration, the value of the lots around the Deerwester and Campbell houses was $47,000 and $52,000,

respectively. The appraisal also valued the remaining useable acres in the Grove at $84,000—$12,000 per acre. As counterdefendant points out, the only way the value of the Deerwester and Campbell lots would have been the same regardless of the configuration of the lots is if the acreage in the Grove had a consistent value.

¶ 54 Moreover, compare the language of the parties' stipulation regarding the lot with the antique store ("the real estate, with any improvements thereon") with the language regarding the two one-acre lots (counterdefendant would "receive clear title to the structure commonly known as 8042 E. 550 N.Rd., McLean, Illinois and a One-Acre parcel of land surrounding the structure"). This indicates the parties' intention to treat the value of the land separately from the value of the structures on the land. Additionally, this view is supported by testimony at trial. The family had a tradition of treating structures separately from the land upon which they sat—indeed, multiple witnesses testified counterplaintiff owned the railroad depot but not the land beneath it and counterplaintiff testified she purchased her sister's interest in the township shed. Moreover, the stipulation specifically stated the value of the one-acre parcels was subject to further order from the trial court.

¶ 55 Contrary to counterplaintiff's argument, the trial court's finding that the one-acre parcels were valued at $12,000 is supported by evidence in the record. Specifically, the appraisal determined the useable acreage in the Grove was worth $12,000 per acre. We acknowledge that usually the appraisal of real property considers any improvements thereon, as the appraisal in this case did for the one-acre lots and the Deerwester and Campbell houses. However, the circumstances of this case are unusual and support the trial court's determination to value all the acreage without considering the structures thereon. As mentioned before, the parties have an unusual family tradition of gifting or owning structures and counterplaintiff never contested

- 16 -

counterdefendant's ownership of the Deerwester and Campbell structures. Accordingly, we conclude the trial court's finding that the one-acre parcels surrounding the Deerwester and Campbell houses were each worth $12,000 was not against the manifest weight of the evidence.

¶ 56                                    C. Judicial Sale

¶ 57        Counterplaintiff next contends the trial court erred by failing to order a judicial sale of the Grove after explicitly determining that the Grove could not be partitioned without manifest prejudice to either of the parties. Counterdefendant asserts this mischaracterizes the trial court's order and the court in fact found it could equitably divide the Grove without manifest prejudice to either party.

¶ 58        Although the trial court noted the commissioner testified he did not believe the property could be equitably divided, the trial court considered the circumstances as they existed at the time the court faced dividing the property. The trial court acknowledged the difficulty of equitably dividing the property but managed to do so. The root of counterplaintiff's manifest prejudice here was her desire to keep the railroad depot in the location chosen by her father in the 1970s and to be able to use the area near the township shed for overflow parking from the antique store. The testimony established these structures were sentimental to counterplaintiff but not of particular value—indeed, counsel for counterdefendant described the township shed as "an old junk garage ready to fall over." We acknowledge counterplaintiff's desire to preserve the local history of Funks Grove. However, the trial court's ruling enables counterplaintiff to preserve the railroad depot's location, at least through her lifetime should she choose to exercise the lifetime lease under the terms of the order. Alternatively, the trial court explicitly determined counterplaintiff owned the railroad depot and could move it to another location if she so chose. Moreover, the testimony established that any other configuration of the one-acre parcel around

the Deerwester house was impractical and counterplaintiff had expressly stipulated counterdefendant owned a one-acre lot.

¶ 59    Furthermore, counterplaintiff cannot complain that the trial court took the parties' stipulations and the prior court orders seriously, particularly where she argues the trial court should have awarded the two one-acre parcels to counterdefendant and ordered the judicial sale of the remainder. This would have resulted in counterdefendant receiving his two lots and counterplaintiff losing any ownership interest in the remaining land. At least under the terms of the trial court's partition order counterplaintiff may elect to keep the depot where it is during her lifetime, or she may elect to move it to another location of her choosing.

¶ 60    For the foregoing reasons, we conclude the trial court ultimately determined the Grove could be equitably divided without manifest prejudice to either party. Here, the court's order shows it carefully divided the property with a particular eye toward fairness to both parties and with a particular sensitivity to counterplaintiff's sentimental attachments to the railroad depot and the township shed.

¶ 61    D. Boundary of One-Acre Parcel

¶ 62    Counterplaintiff next argues the trial court erred by not reading any ambiguity in the March 2011 agreement against counterdefendant in determining the boundary of the lot around the Deerwester house. We disagree.

¶ 63    First, the March 2011 agreement does not address the boundaries of the two one-acre parcels. Thus, as to the boundary, there is no ambiguity to read against counterdefendant. Moreover, the evidence established that any other configuration of this lot would be impractical. Although the parties stipulated to testimony that another entrance to the Deerwester house could be added, conflicting evidence at trial established the difficulty in doing so. Additionally, as

noted above, the court's determination that it could equitably divide the property without manifest prejudice to either party was not against the manifest weight of the evidence. Counterplaintiff retained her interest in the depot and could move the depot if she wished. The right to partition will not yield to any hardship, inconvenience, or difficulty. *Rosenbaum*, 38 Ill. App. 3d at 15.

¶ 64                                              E. Partition

¶ 65            Finally, counterplaintiff asserts the trial court erred in adopting counterdefendant's proposed partition of the remainder of the Grove. Counterdefendant drew an arbitrary line across the entire parcel to be divided and proposed he receive everything south of the line while counterplaintiff received everything north of the line. Counterdefendant argues that counterplaintiff failed to provide the trial court with any alternative to this proposal. Our review of the record shows counterplaintiff proposed alternate boundaries for the one-acre lots, but she failed to offer any alternative evidence to divide the remainder of the Grove. Accordingly, we conclude counterplaintiff has failed to meet her burden of proof. Moreover, as discussed above, counterplaintiff reprises her arguments about manifest prejudice with respect to the depot and the township shed, but we have concluded she cannot establish that the partition resulted in manifest prejudice.

¶ 66                                         III. CONCLUSION

¶ 67            For the reasons stated, we affirm the trial court's judgment.

¶ 68            Affirmed.