2024 IL App (1st) 230542-U

FIRST DISTRICT,
FIRST DIVISION
January 22, 2024

No. 1-23-0542

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| BCSP 330 NORTH WABASH PROPERTY LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 2020 CH 01378 |
| | ) | |
| 401 NSS, LLC, | ) | Honorable |
| | ) | Anna H. Demacopoulos, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:* (1) Plaintiff did not raise issue of fact as to alleged fundamental mistake in appraiser's conclusion that the highest and best use of the subject property was commercial. (2) Issue of fact precluding summary judgment existed as to whether appraiser assumed a maximum building area that was not permissible under controlling zoning regulations.

¶ 2    Plaintiff BCSP 330 North Wabash Property LLC (BCSP) leases property from defendant 401 NSS, LLC (NSS). In 2019, BCSP exercised its option to renew the lease for a 25-year term. The lease provides that annual rent for the optioned term will be set at 5.5% of the property's

value, as determined by the "appraisal valuation agreed upon by any two of *** three appraisers" hired by the parties.

¶ 3    The property is currently a parking garage. Two of the three appraisers found the highest and best use of the land was commercial, resulting in a higher valuation and a 513% increase in rent. BCSP brought the instant suit against NSS, seeking a declaratory judgment that the valuation was "a result of fundamental mistake" based on its allegation that developing the property as a commercial building would violate controlling zoning regulations. The trial court granted summary judgment in favor of NSS. For the reasons that follow, we reverse and remand.

¶ 4                                BACKGROUND

¶ 5    BCSP owns an office and hotel tower at 330 North Wabash Avenue (the AMA Plaza) and leases the abutting property at 401 North State Street (the Property) from NSS. The Property is improved with an 11-story parking garage with 896 parking spaces and has been operated as a public parking garage since its construction was completed in 1979. The lease term for the Property is 25 years, to be renewed at the tenant's sole option.

¶ 6    In 2019, BCSP exercised its option to renew. The lease provides that if the parties cannot agree on rent for the optioned term, each party shall appoint an appraiser to value the Property as "vacant land, free and clear of leases and improvements at its fair cash market value at private sale" at the start of the new term. If the two appraisers agree on value, "such appraisal valuation shall be binding upon the parties." If not, a third appraiser appointed by the first two appraisers also appraises the Property, and "the appraisal valuation agreed upon by any two of such three appraisers shall be binding upon the parties." Annual rent for the optioned term is fixed at 5.5% of the appraisal valuation.

¶ 7    BCSP's appraiser, William Kastilahn, determined the Property's highest and best use to be a parking garage and valued it at $12,500,000. NSS's appraiser, Gary DeClark, determined the Property's highest and best use to be commercial and valued it at $28,000,000. They selected Patricia McGarr as the third appraiser.

¶ 8    In her appraisal, McGarr analyzed the zoning requirements for the Property. The AMA Plaza (designated Subarea A) and the Property (designated Subarea B) together comprise a Business Planned Development (PD 65). Zoning for the PD requires that "402 parking spaces must be in the entire [PD] to support the use in [the AMA Plaza]." McGarr "assume[d]" that "approximately 400± spaces" would need to be located on the Property. She wrote to the City of Chicago Department of Planning and Development requesting clarification as to "whether the subject property must remain a parking facility or whether another use and structure could possibly be constructed on the site." She received an October 21, 2019 opinion letter stating:

"[W]ithout a specific development proposal and/or use, we cannot provide a detailed response. The permitted commercial uses in the DX District in Section 17-4-0207 of the Zoning Ordinance may be permitted within the existing structure. However, any modification to the existing structure or use may require approval of a minor change or amendment ***. Also, the replacement of the existing structure with a new structure would require an amendment to the Planned Development."

Based on this letter, McGarr concluded that "a wide variety of commercial uses would be allowed at the Subject Property" since DX districts are zoned for, among other uses, "artist work or sales spaces, business support services, eating and drinking establishments (including taverns), food and beverage retail sales, liquor stores, hotel/motel, medical service, office, non-accessory

parking, general retail sales, indoor sports and recreation, auto supply and accessory sales, and motor vehicle repair shops."

¶ 9     McGarr determined that the highest and best use of the Property "as vacant" would be to develop it with a 361,980 square foot commercial building "that could include hotel, office, and retail, and supporting parking." She acknowledged that "the Planned Development requires that Sub Area B supply 400± parking spaces for the structure as built in Sub Area A," which she characterized as "an extraordinary development cost that burdens the Subject development site," although the cost would be partially offset by the "opportunity for revenue" from the parking spaces. She concluded that "if the entire property were vacant and available to be developed, the value of the underlying land would be approximately $24,600,000."

¶ 10    DeClark agreed with McGarr's appraisal. NSS fixed the monthly rent in accordance with McGarr and DeClark's valuations, resulting in an increase from $18,388.69 to $112,750. BCSP notified NSS it would pay this amount only under protest and without prejudice to its rights.

¶ 11    On February 3, 2020, BCSP filed the instant declaratory judgment action. In its amended complaint, BCSP alleged that the PD's parking requirement "is continuous and must be met at all times." Development of the Property for commercial uses "would take several years, during which the 402 parking spaces required by the [PD] would not be available to Subarea A." BCSP claimed that McGarr's appraisal is fundamentally flawed because it "improperly assumes that there can be a temporary hiatus in the zoning parking requirement while Subarea B is developed." BCSP sought a declaration "that McGarr's appraisal valuation is a result of fundamental mistake" and that "NSS is in material breach of the lease agreement by requiring BCSP to pay a higher amount of rent based on an erroneous appraisal." BCSP also included counts for breach of contract and unjust enrichment that are not at issue in this appeal.

¶ 12　　　　　　On September 30, 2020, the trial court granted NSS's motion to dismiss the complaint, finding that McGarr's discussion of the parking requirements in her appraisal "directly contradicts [BCSP's] allegations of a fundamental mistake." The court further stated that the appraisal process set forth in the lease was a "theoretical exercise" in valuing the land as if it were vacant and put to its highest and best use, even though "everyone knew and assumed *** the structure would continue to exist as is with the parking spaces available." Finally, the court stated: "Even if, *arguendo*, it would be necessary to consider that parking would be unavailable for the time of construction, which it is clearly not in this case (see *supra*), it is totally reasonable to assume a Building Permit would be issued if there is assurance zoning requirements will be adhered to once construction is completed." (Emphasis in original.)

¶ 13　　　　　　BCSP filed a motion to reconsider which the trial court granted as to the declaratory judgment count only, stating that the court's "presumption the zoning requirements would or could be waived appear[s] to be based on a factual consideration unable to be fully addressed at the motion to dismiss stage of the litigation."

¶ 14　　　　　　In discovery, BCSP deposed McGarr, who testified that she is aware the Property is improved with a 292,000 square foot parking garage, but "pursuant to [the] hypothetical conditions" under which she conducted her appraisal, she "had to presume that parking garage did not exist and the site consisted of only vacant land." BCSP's counsel sent her a letter saying "it's inappropriate to think that you could tear down the [parking garage] because then the [AMA Plaza] would be without parking." McGarr considered this objection to be "blowing off the instructions of the lease to value it vacant." As vacant, the property would be able to contain fewer than 100 parking spaces; therefore, "[y]ou have to build it." She estimated it would take two to seven years to build a commercial building as set forth in her appraisal. She stated that the

opinion letter from the Department of Planning and Development refuted Kastilahn's belief that the Property "could only be a parking facility," though she acknowledged that a potential buyer of the property would need to secure approval from the City to build a commercial structure.

¶ 15    The PD was originally issued in 1968 upon the application of IBM, which owned the property in Subarea A and leased the property in Subarea B. Construction of the AMA Plaza (then known as the IBM Building) was completed in 1972, and the parking garage was completed seven years later in 1979. McGarr observed that "we had seven years that the tenant was not following the Planned Development" because the parking spaces were not yet available for use, although she did not know whether IBM applied to the city for temporary relief from the zoning requirements during that time.

¶ 16    According to the PD, the maximum floor area ratio (FAR) for Subarea A is 26.0, the maximum for Subarea B is 12.0, and the maximum for the entire PD is 21.0. McGarr's appraisal "utilized the maximum FAR" of 12.0 in calculating the maximum building size as 361,980 square feet. Counsel for BCSP pointed out that adding together the maximum permitted FAR for Subareas A and B results in a collective FAR of 21.8, which exceeds the collective maximum FAR for the PD as a whole. McGarr acknowledged this "discrepancy" and stated: "[T]his is not something you typically see. These numbers typically match. So if they don't, there is a reason. If there is not a reason, somebody made a mistake." She did not know why this discrepancy existed and did not account for it in her appraisal. Asked whether it would require her to modify her valuation of the property, McGarr said she "wouldn't make that statement" without clarifying with the City whether the discrepancy was intentional.

¶ 17    BCSP obtained opinions from four experts. George Kisiel, a licensed architect and certified planner, stated in an opinion letter that under the provisions of PD 65, the Property "can

be developed with a maximum of 285,745 square feet which is 76,235 square feet less than the 361,980 considered by Appraiser McGarr and would result in a reduction in value of $5,193,980." Citing section 10-502 of the Chicago Zoning Ordinance (Chicago Municipal Code § 17-10-502 (amended June 25, 2014) ("Offstreet parking spaces that are required by this Zoning Ordinance must be maintained for the life of the principal use")), Kisiel stated that the value should be further reduced by $4,824,000 based on the "cost of providing interim parking during *** construction" of the proposed commercial structure, which he estimated would take three years.

¶ 18        Charles Argianas, an attorney and certified real estate appraiser, opined that McGarr's appraisal was "fundamentally flawed" because she did not consider "the zoning requirement for 402 parking spaces on a continuous basis at all times," which would require interim parking arrangements to be made for Subarea A during the time of construction. She also did not consider the "political challenges" and consulting and legal fees involved in "[r]edevelopment planning and negotiation with the City."

¶ 19        Joe Perez, a licensed real estate broker, "analyzed the cash flows" from McGarr's proposed development and concluded that "a reasonable market participant would not consider the development opportunity described in [McGarr's] appraisal to be financially feasible." John Hammerschlag, an "owner, developer, investor, and asset manager" in the parking industry, opined that McGarr underestimated the construction cost for 400 parking spaces in her proposed development.

¶ 20        NSS obtained opinions from two experts. Michael MaRous, a certified appraiser, opined that McGarr's appraisal was "reasonable, well-supported, and credible." He stated that "the 402 minimum parking spaces set forth by BPD 65 would be considered accessory parking spaces

and, therefore, would not be included toward the maximum square feet of buildable area" based upon the allowed FAR. He agreed with McGarr's opinion that a potential purchaser would consider both the costs and the revenue generated by providing the required parking spaces.

¶ 21        Chris Leach, a zoning attorney, stated that Subareas A and B "have separate and distinct zoning rights pursuant to PD 65," and Subarea B has a maximum FAR of 12.0, as "expressly stated in the Bulk Table of PD 65 and *** confirmed by the Advisory Opinion issued by the Zoning Administrator of the City of Chicago dated October 21, 2019." He observed that, although PD 65 requires the development to contain 402 off-street parking spaces, it does not specify whether they should be located on Subarea A or B. He also agreed with McGarr's conclusion that the zoning uses permitted on Subarea B include all commercial uses permitted in the DX-16 zoning classification, including hotel, retail, restaurant, and parking uses.

¶ 22        The parties filed cross-motions for summary judgment. On February 26, 2023, the trial court granted NSS's motion, denied BCSP's motion, and entered judgment in favor of NSS.

¶ 23                                                          ANALYSIS

¶ 24        Summary judgment is appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2018). We construe the record strictly against the movant and liberally in favor of the nonmoving party. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). To prevail, the nonmoving party must present some evidence that would arguably entitle it to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010). We review the trial court's grant of summary judgment *de novo*. *Williams*, 228 Ill. 2d at 417.

¶ 25        "[W]hen *** parties agree to have value fixed by an appraisal, they must abide by their own agreement." (Internal quotation marks omitted.) *Bailey v. Timpone*, 75 Ill. 2d 539, 546

(1979). Moreover, "appraisers have wide discretion with respect to the methods and procedures they follow in determining value." *In re Estate of Lambrecht*, 375 Ill. App. 3d 865, 872-73 (2007) (citing *Board of Education of City of Chicago v. Gorenstein*, 179 Ill. App. 3d 388, 394 (1989) (where the lease did not designate a particular appraisal technique, plaintiff's "objections on appeal to the cost approach used by the three appraisers *** are not legally sufficient to preclude [defendant's] motion for summary judgment")). Thus, we will not set aside an appraiser's determination of value "merely because it might appear *** to be too high or too low," but only "(1) upon a showing of a fundamental mistake more than mere error of judgment, (2) disqualification of the appraisers, (3) fraud or (4) undervaluation such as to give rise to an inference of bad faith, partiality or constructive fraud." *Schipper & Block, Inc. v. Carson Pirie Scott & Co.*, 122 Ill. App. 2d 34, 47 (1970).

¶ 26    NSS argues that BCSP's claims of fundamental mistake are "not cognizable" in the absence of bad faith or fraud, neither of which is alleged in this action. We rejected this proposition in *Schipper & Block*, in which we ordered an appraisal be set aside based on multiple "fundamental mistakes" made by the appraisers. *Id.* at 47-48. We declined to rule on plaintiff's allegations of fraud, stating: "This is not to say that fraud either actual or constructive has been shown or is required to be shown by the plaintiff in order to invalidate the appraisals." *Id.* at 49.

¶ 27    Here, BCSP argues that McGarr's appraisal was fundamentally mistaken because her "highest and best use" for the property—*i.e.*, a 361,980 square foot commercial building "that could include hotel, office, and retail, and supporting parking"—is incompatible with controlling zoning regulations that (1) require 402 parking spaces be continuously available for the benefit of the AMA Plaza and (2) limit the combined FAR of the PD to 21.0. (Although DeClark agreed

with McGarr, BCSP does not allege any fundamental mistake in DeClark's appraisal.) We consider these arguments in turn.

¶ 28                                    Parking Space Requirement

¶ 29          BCSP argues that constructing McGarr's proposed commercial structure on the property, which she estimated would take two to seven years, would violate the zoning requirement that the property "continuously provide[]" 402 parking spaces accessory to Subarea A. In support, BCSP cites section 10-502 of the Chicago Zoning Ordinance, which provides that "[o]ff-street parking spaces that are required by this Zoning Ordinance must be maintained for the life of the principal use." Chicago Municipal Code § 17-10-502 (amended June 25, 2014).

¶ 30          Initially, NSS argues that the zoning regulations do not specify how the 402 spaces are to be allocated between Subareas A and B. However, the lease does not instruct the appraisers to consider Subarea A (the AMA Plaza) as vacant, and there has been no evidence adduced that the AMA Plaza contains any of the requisite parking spaces. NSS's expert appraiser MaRous acknowledged that "any development of Sub Area B would require the inclusion of the requisite number of off-street parking spaces to comply with the minimum 402 parking spaces applicable to BPD 65."

¶ 31          More importantly, though, BCSP's argument is flawed because it does not take into account the lease's direction to the appraisers to value the property as "vacant land, free and clear of leases and improvements." BCSP states that during construction of a commercial building, "the required parking would *cease* *** to be available to Subarea A" (emphasis added)—which presupposes that such required parking exists in the first instance. On vacant land, it would not. As McGarr explained in her deposition: "[O]n that site, *** you maybe could fit, maybe 100 cars. *** So it wouldn't satisfy the Planned Development to leave it vacant. You

have to build it." Under the theoretical assumption that the property is vacant, *any* proposed use—including a parking garage—would unavoidably entail a period of construction during which time the parking would not yet be available. (In fact, the record reflects that construction of the existing parking garage was not completed until seven years after completion of the office tower in Subarea A, during which time the parking requirement was not satisfied.) It could not have been the intent of the contracting parties for this fact to preclude appraisers from determining the highest and best use for the property. See *Stonegate Insurance Co. v. Smith*, 2022 IL App (1st) 210931, ¶ 37 (courts construe contracts to avoid absurd results).

¶ 32    BCSP argues that "the original contracting parties' course of performance indicates that they did, in fact, intend for Sub Area B to be appraised as it if it were to be used as a parking garage." "Where the language of a contract is plain, it provides the best evidence of the parties' intent and will be enforced as written." *Carey v. Richards Building Supply Co.*, 367 Ill. App. 3d 724, 727 (2006). The lease plainly provides that the property will be appraised as vacant land. If the parties wished to have the property appraised as a parking garage, they could have bargained for that language instead. As the trial court aptly stated in its September 30, 2020 order dismissing the complaint:

> "Although the appraisal was based on this theoretical construct [*i.e.*, appraising the land as vacant], the parties knew and agreed the structure would continue to exist as it presently stands. The theoretical exercise in valuing the land did not result in parking spaces not being available. To the contrary, the presumption was that the Lease would continue for the structure currently existing ***. It is a tautology to argue the parking spaces would not be available when everyone knew and assumed the appraisal exercise was theoretical."

¶ 33 Accordingly, we find that McGarr committed no fundamental mistake in finding the highest and best use of the property to be commercial rather than a parking garage.

¶ 34                                     Floor Area Ratio

¶ 35 BCSP argues that McGarr's proposed 361,980 square foot structure, which is "based solely on the maximum FAR applicable to [Subarea B] *individually*, *** is grossly in excess of the more restrictive 21.0 FAR limitation that applies to the PD 65 parcel *as a whole* when the structure already existing on Subarea A is taken into account." (Emphasis in original.)

¶ 36 NSS argues that this claim is forfeited because BCSP raised it for the first time in its motion for summary judgment. "[S]ummary judgment motions are limited to the issues raised in the complaint, and a plaintiff cannot raise new issues not previously pled in its complaint in order to obtain, or defeat a motion for, summary judgment." *800 S. Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 43; see also *Gold Realty Group Corp. v. Kismet Cafe, Inc.*, 358 Ill. App. 3d 675, 680 (2005).

¶ 37 In *Feliciano v. Geneva Terrace Estates Homeowners Ass'n*, 2014 IL App (1st) 130269, plaintiffs alleged in their amended complaint that defendants breached their fiduciary duties as board members. In opposition to defendants' motion for summary judgment, plaintiffs alleged for the first time that defendants breached their fiduciary duties based on "failure to inform them that they would not be sued." *Id.* ¶ 33. We found that plaintiffs did not forfeit their claim, because they "added [an] additional basis for alleging a breach of fiduciary duty and did not add a whole new theory of liability." *Id.* ¶ 34. We additionally found it significant that defendants did not allege they were surprised by this additional basis for liability. *Id.*

¶ 38 In its amended complaint, BCSP alleged that McGarr's appraisal could not stand due to fundamental mistake, as it did not take into account the continuous parking requirement for the

PD. In its motion for summary judgment, BCSP additionally argued that McGarr's appraisal was fundamentally mistaken for ignoring the collective FAR requirement for the PD. As in *Feliciano*, this is not "a whole new theory of liability" but merely an "additional basis" for its claim of fundamental mistake. Moreover, NSS does not allege any surprise or prejudice. On the contrary, the record reflects that NSS obtained opinions from multiple expert witnesses on the subject, which was fully briefed and argued by both sides before the trial court. Accordingly, we do not find that BCSP forfeited this argument.

¶ 39　　　　It is undisputed that there is a discrepancy in the maximum FAR permitted for the subareas of PD 65 vis-à-vis the whole development: the maximum FAR for Subarea A individually is 26.0, and the maximum for Subarea B individually is 12.0, but adding them results in a collective FAR of 21.8, whereas the PD limits the collective FAR to 21.0. McGarr acknowledged she did not account for this discrepancy in her appraisal when she "utilized the maximum FAR" of 12.0 in calculating the maximum building size as 361,980 square feet. This figure was crucial to her appraisal, since she calculated the sale price of the property in value per square foot. Although "appraisers have wide discretion with respect to the methods and procedures they follow in determining value" (*Lambrecht*, 375 Ill. App. 3d at 872-73), it cannot be said that McGarr exercised discretion when she failed to realize the existence of this discrepancy in drafting her appraisal. *Cf. In re Estate of LaPlume*, 2014 IL App (2d) 130945, ¶ 54 (trial court commits error when it does not exercise discretion because it fails to realize that it has discretion). McGarr further testified that she did not know the reason for the discrepancy, and, without clarification from the City, she could not tell whether it would require her to modify the valuation conclusions in her appraisal. She explained:

"If this is the City's fault that they made a math error *** that might be amended just to correct the math. Meaning that instead of 21, it goes to 21.8, which is what the intent was. We don't know. *** [I]t's either an error or there are things being considered that *** aren't identified here, with regards to building over right of ways, aerial easements."

¶ 40    Because the record does not reflect the reason for this discrepancy, it is unclear whether the City would permit Subarea B to be built to its maximum individual FAR of 12.0. Accordingly, we find an issue of material fact exists as to whether McGarr's appraisal was fundamentally mistaken in assuming the full 12.0 would be available. We express no opinion on the ultimate merits of this claim, but we find the record insufficiently developed to determine that NSS "is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2018).

¶ 41                                    CONCLUSION

¶ 42    For the foregoing reasons, we reverse the judgment of the trial court granting summary judgment in favor of NSS solely on the issue of whether McGarr's appraisal was fundamentally mistaken in not taking into account the maximum permitted FAR for the PD, and we remand for further proceedings.

¶ 43    Reversed and remanded.