NOTICE
Decision filed 08/26/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230154-U

NO. 5-23-0154

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PURGATORY CELLARS, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 20-LM-10 |
| | ) | |
| KENNETH R. NEIGHBORS, PATRICIA H. | ) | |
| NEIGHBORS, BRIAN K. NEIGHBORS, and | ) | Honorable |
| JOY NEIGHBORS, | ) | Robert Hopkins and |
| | ) | Mark Shaner, |
| Defendants-Appellants. | ) | Judges, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court correctly determined that three of the *pro se* defendants failed to enter timely appearances, and the court did not abuse its discretion in entering default ejectment orders against them. The court's award of mesne profits was not against the manifest weight of the evidence. The award of damages for missing property was likewise not against the manifest weight of the evidence. The award of damages for cleanup of the premises was against the manifest weight of the evidence where the award was calculated based on a bid for cleaning the property and where the plaintiff acknowledged that, due to a subsequent sale of the property, it did not and would not incur this cost.

¶ 2   The plaintiff, Purgatory Cellars, LLC, filed a complaint seeking ejectment and damages for the unauthorized use of its property by the defendants, Brian and Joy Neighbors and Kenneth and Patricia Neighbors. The complaint alleged that the defendants, neighboring landowners, had been storing lumber and equipment related to a lumber business on the plaintiff's property without

1

authorization. The defendants acted *pro se*, and only Brian Neighbors appeared at all hearings or filed a timely written appearance in the matter. Early in the proceedings, the court entered an ejectment order against Brian and default ejectment orders against the other three defendants. It subsequently awarded damages for mesne profits, the value of missing boxes of empty wine bottles, and the cost of cleaning up the property. The defendants appeal, arguing that (1) the court abused its discretion in entering a default order against three of the defendants and (2) the court erred in awarding all three types of damages. The defendants filed a motion to strike portions of the plaintiff's brief, arguing that the plaintiff improperly cited to a proposed bystander's report that was not certified by the trial court or stipulated to by the parties. We grant the defendants' motion to strike. We reverse the portion of the court's judgment awarding damages for cleanup costs; however, we affirm all other portions of the judgment.

¶ 3                                I. BACKGROUND

¶ 4     This case comes to us after a complicated factual background and procedural history. The property at issue has since been sold, but it was previously owned by the plaintiff. Brian Neighbors and his wife, Joy, own property adjacent to the plaintiff's property to the south. Kenneth and Patricia Neighbors, Brian's parents, jointly owned a different parcel, which is adjacent to the plaintiff's property to the northeast. Patricia passed away in May 2021, while this litigation was pending. Because the defendants share a last name, we will refer to them by the first names throughout this decision.

¶ 5     The plaintiff's predecessor, Flat Rock Holdings, LLC, purchased the property at issue in 2006. The plaintiff's parent company is Forsythe Land Company (Forsythe). Prior to the sale, the property was used as a winery operated by its previous owner, White Owl Winery. The plaintiff

2

continued that use until 2011. Brian was employed by the plaintiff as its winery manager. Although the winery closed in 2011, the plaintiff did not sell the property for several years.

¶ 6    The dispute leading to this lawsuit arose in the fall of 2019, when the plaintiff decided to sell the property. In contemplation of listing the property for sale, Forsythe's property manager, Amie Kennedy, visited the premises. She discovered piles of lumber, tractors, and vehicles that did not belong to the plaintiff.

¶ 7    Kennedy contacted Barry Sloss, an attorney representing Forsythe, who in turn contacted Brian Neighbors. On October 10, 2019, Brian told Sloss that the Neighbors's use of the property was pursuant to an agreement with Forsythe's farm manager, Allen Hollingsworth. He explained that under this agreement, Hollingsworth allowed them to store equipment on the plaintiff's property in exchange for mowing the grass and keeping an eye on the property. Sloss informed Brian that Hollingsworth did not have the authority to make such an agreement, that any agreement to that effect was now terminated, and that the defendants must remove their lumber and equipment from the property.

¶ 8    On October 15, 2019, Sloss sent a letter to Kenneth and Patricia Neighbors demanding that they remove all their personal property from the premises by October 31. Sloss also informed them that during his previous discussion with Brian, Brian had mentioned that Kenneth and Patricia might know someone interested in purchasing the property. He requested that if they knew of a potential buyer who was "interested in making an offer," they advise that individual to contact Amie Kennedy regarding the property. Brian acknowledged receiving a copy of the letter, although it was addressed only to Kenneth and Patricia.

¶ 9    In November 2019, the plaintiff entered into a contract to sell the property to Russell and Christina Neighbors. Russell is Kenneth's nephew. As we will discuss in more detail later, that

contract resulted in litigation in which the plaintiff in this case filed a third-party complaint against the defendants in this case. The sale ultimately took place in the latter half of 2021, while the proceedings in this case remained pending.

¶ 10     On July 15, 2020, the plaintiff filed an ejectment complaint against all four defendants, alleging that as of July 8, 2020, they had not complied with the demand to remove their lumber and equipment from the premises owned by the plaintiff. The complaint further alleged that the defendants did not pay rent for use of the premises and did not have authorization to use the premises. In its prayer for relief, the plaintiff requested damages and an order directing the defendants to remove their lumber, equipment, and any other personal property from the premises.

¶ 11     The record indicates that the court immediately set the matter for an August 3, 2020, hearing. Returns of service were filed on July 30, demonstrating personal service of process on all four defendants on July 22 and 23.

¶ 12     On July 30, 2020, Brian filed two *pro se* pleadings. One was styled as a "Special and Limited Appearance." In it, he stated that he "has not had sufficient time since service to be allowed to file a proper answer or otherwise respond to the complaint." The other pleading was a motion to continue, which was purportedly filed on behalf of all four defendants but was signed only by Brian. In it, Brian alleged that none of the four defendants were able to attend the hearing scheduled for August 3. He explained that his wife, Joy, was scheduled to have surgery on that day and that he needed to be there with her. He further explained that his mother, Patricia, was recovering from cancer treatment and that Kenneth was her caregiver. The court granted the motion to continue over the plaintiff's objection and reset the matter for a September 4, 2020, hearing.

¶ 13    On September 1, 2020, the defendants filed a *pro se* motion to dismiss, which was signed by all four. They first argued that the plaintiff's complaint was moot, alleging that the defendants had, "in good faith, removed the logs, lumber, and equipment, and personal property from the land in question." They did not state when this had occurred. The defendants next alleged that Russell Neighbors had entered into a contract with the plaintiff for the sale of the property in November 2019; that Russell wanted to continue the arrangement previously agreed to by the defendants and Hollingsworth; and that the defendants thus believed it was "unnecessary for Kenneth to quit the property" in view of the pending sale. The defendants argued that this case was redundant because pending litigation involving the contract for sale (case number 20-CH-7) would "settle the ownership issue" and resolve the questions in this case as well. Finally, the defendants alleged that Brian and Joy had no interest in or involvement with Kenneth's lumber business. In addition, the defendants denied all allegations in the complaint. They requested either dismissal of the complaint in its entirety or "an extension until after the property ownership issue is established by this Court in case 2020-CH-7." Unlike the earlier pleadings filed by Brian, the motion to dismiss was signed by each of the four defendants.

¶ 14    On September 4, 2020, the court held an ejectment hearing. Brian was the only defendant to attend. In a docket entry dated that day, the court granted the plaintiff's claim for ejectment against Brian based on the evidence presented and entered a default order of ejectment against the other three defendants. The court ordered the defendants to remove their lumber and equipment within 30 days. According to the defendants, the court informed Brian that his wife and parents could file motions to vacate the default order against them within 30 days.

¶ 15    On September 29, 2020, Joy, Patricia, and Kenneth filed motions to vacate the default ejectment order against them. They did not notice these motions for a hearing, and the court never directly ruled on them.

¶ 16    The matter came for the first hearing on damages on November 6, 2020. Brian and Joy were the only defendants in attendance. A docket entry indicates that, after hearing testimony from both parties, the court found evidence that the plaintiff had incurred damages for (1) impaired use of the property from January to November of 2020, (2) the loss of 240 missing boxes of empty wine bottles, and (3) the necessity of cleaning up the property. In addition, the court stated, "Defendants agree and are hereby ordered to clean up the open building, including hauling off the lumber and trash." The court continued the matter for further hearings on damages.

¶ 17    On April 5, 2021, the court held a hearing via the Zoom platform. This time, all four defendants appeared. During a recess in the hearing, the defendants filed a motion to dismiss the plaintiff's claim for damages, arguing that the claims involved in this litigation are redundant and duplicative of those at issue in number 20-CH-7; alleging that this case was brought by the plaintiff in bad faith; asserting that Brian and Joy should not have been added as defendants because they were not involved in the logging operation; and contesting various elements of damages claimed by the plaintiff. In a docket entry, the court struck the motion to dismiss the plaintiff's claim for damages, finding it to be duplicative and untimely.

¶ 18    After a series of continuances, the matter again came for a hearing on damages on June 23, 2022. Brian and Joy attended the hearing; Kenneth did not. (As noted earlier, Patricia passed away in May 2021.) Brian and Joy presented the testimony of Russell Neighbors and Charles Kivlehen. Kivlehen was a former employee of the plaintiff who testified concerning the missing cases of bottles. In particular, he noted that during his tenure, the plaintiff received a shipment of defective

6

bottles. Although the supplier replaced the defective bottles with good bottles, it asked the plaintiff not to return the defective bottles. Kivlehen did not provide an estimate of how many defective bottles were in the shipment.[1] The matter was once again continued for further hearings.

¶ 19    On August 5, 2022, the court held its final hearing on damages. Both parties rested, and the court directed the parties to file written arguments.

¶ 20    On the same day, the defendants filed a motion to vacate the ejectment order. They once again argued that this case was duplicative of the issues involved in case number 20-CH-7, which had been resolved by this time. They argued that, because the property was now owned by Russell and Christina, the plaintiff lacked standing to request ejectment. The defendants further asserted that all three of the plaintiff's claims for damages were meritless, alleging that (1) the defendants had paid rent for use of the property in the form of mowing the grass around the buildings, thus negating any claim for mesne profits; (2) the cases of bottles the plaintiff alleged to be missing contained defective bottles with no commercial value, and they had been moved to a different area of the property as part of the defendants' cleanup efforts; and (3) the plaintiff had dismissed its claim for damages related to the cleanup of the property.

¶ 21    The plaintiff responded with a motion to deny the defendants' motion to vacate. The plaintiff noted that the order for ejectment was entered on September 4, 2020, nearly two years before the defendants filed their motion to vacate it in August 2022. The plaintiff thus argued that the defendants' motion was untimely whether construed as a motion to vacate a default judgment,

_____

[1]We note that our summary of Kivlehen's testimony comes from the findings of fact contained in the court's memorandum of decision in this matter. The record on appeal does not contain transcripts from any of the hearings. The record does contain multiple proposed bystander's reports; however, as we will discuss in more detail later in this decision, none of them were either agreed upon by the parties or certified by the trial court. See Ill. S. Ct. R. 323(c) (eff. July 1, 2017) (providing that only a bystander's report that has been stipulated to by the parties or certified by the trial court may appear in the record on appeal).

a motion to dismiss, or a motion to reconsider the court's September 4, 2020, ruling. The plaintiff argued that the motion should be denied on this basis.

¶ 22    On November 14, 2022, the court entered a detailed memorandum of decision. The court first addressed the defendants' motion to vacate the ejectment order. The court found that the motion was untimely, having been filed 23 months after the ejectment order was entered. The court also noted that the defendants' motion was not verified or supported by an affidavit. The court nevertheless addressed the merits. Taking judicial notice of number 20-CH-7, the court noted that the third-party claim in that case involved money that the plaintiff in this case (which was the defendant in 20-CH-7) was required to pay to remove liens from the property so it could complete the sale to Russell and Christina. It did not involve the ejectment issue. The court further noted that the plaintiff transferred the property to Russell and Christina sometime after July 7, 2021, but emphasized that the plaintiff was the owner between September 4, 2020, and the date of the transfer, thus entitling the plaintiff to damages for that period.

¶ 23    The court next considered the plaintiff's claim for mesne profits. The court considered two exhibits provided by the plaintiff to demonstrate the reasonable rental value of the property for storage of lumber and equipment. Exhibit 7 showed the rental value of storage units at Marshall Safe Storage, a self-storage facility owned by Forsythe. The court rejected this exhibit, finding that it was not comparable because Marshall Safe Storage contained "discrete and secure" storage units. By contrast, the court noted that the plaintiff's property contained one building that was open and another that was "relatively secure" but did not include secure divisions within the building. Exhibit 15 was a printout from the internet that showed the cost of renting outdoor uncovered storage units for boats and recreational vehicles from another storage facility, Super A+ Storage.

The court found this to be more comparable to the plaintiff's property because the prices quoted in the exhibit were for open storage.

¶ 24    In determining the reasonable rental value of the property for the use made of it by the defendants, the court noted that the plaintiff's property was less secure than Super A+ Storage's facility. It discounted the rental value in accordance with this finding. In addition, the court made adjustments for the size of the area used for storage. Based on these calculations, the court found that the rental value of the property for the period in which the defendants continued to store their lumber and equipment there was $13,800 for one year.

¶ 25    The court found that the defendants were not entitled to an offset for the value of the service the defendants provided by mowing the property. The court explained that damages were sought only for the period after October 31, 2019, at which time it was undisputed that the parties had no agreement.

¶ 26    Next, the court considered the value of the missing cases of wine bottles. The court first discussed the pertinent testimony and exhibits. The court noted that the bottles and other items of personal property were not sold to Russell and Christina. Thus, the court concluded that they were the property of the plaintiff.

¶ 27    The court further noted that Amie Kennedy testified that three pallets containing 240 boxes of unused wine bottles were missing from the winery building when she inspected the property in the fall of 2020. She identified a photograph of the boxes taken in March 2011, which was entered into evidence. Initially, Kennedy testified that each case contained 12 bottles and had a value of

$47.95 per case, for a total value of $11,500.[2] At a subsequent hearing, however, the plaintiff introduced into evidence an exhibit showing a lower cost of replacement for the missing bottles.[3]

¶ 28    The defendants' witness, Charles Kivlehen, testified that he worked for the plaintiff as an assistant winemaker from 2007 to 2010. During this period, a supply company sold the plaintiff defective wine bottles. Although Kivlehen was not certain of the exact time the plaintiff received the defective bottles, he believed it was in 2007. He further testified that the supplier replaced the defective bottles with good bottles but requested that the plaintiff not return the defective bottles. Kivlehen did not know how many bottles were defective, and he did not know how many defective bottles remained on the premises after he left his position in 2010. Kivlehen estimated that the cost of a case of good bottles was $8 to $10 in 2008 and that the cost at the time of the hearing was $12 to $15 per case.

¶ 29    Brian Neighbors testified that 240 boxes of defective wine bottles were placed in the building he referred to as the "junk shed" and were still on the premises. The defendants offered into evidence photographs of boxes in crates in the "junk shed."[4]

---

[2]Although not mentioned by the court in its memorandum of decision, this estimate was supported by a printout from the Etsy website offering 12 bottles at that price. The printout was admitted into evidence and appears in the record as an exhibit. The bottles at issue in this case came in boxes of 12. The defendants state in their brief that they objected to this exhibit on the grounds that it does not reflect the cost of purchasing bottles within the wine industry.

[3]The exhibit was a copy of an invoice from a bottle supplier to Broken Earth Winery. The invoice was dated 2020. It showed charges of $7.48 per case of 12 bottles plus a $1.36 per case surcharge for what the supplier called "additional government-imposed tariffs." These figures result in a total cost of $8.84 per case. Handwritten notes indicate that 192 cases at $7.48 per case would total $1436.16. The court noted in its memorandum of decision that the exhibit showed a total replacement cost in this amount. Although this total ignores the surcharge and understates the number of missing cases, the court's ultimate finding concerning the value of the missing bottles did consider the evidence that 240 cases were missing.

[4]The property contains two buildings. Both parties refer to one building as the "winery building." The defendants refer to the other building as the "junk shed," while the plaintiff refers to it as the "storage building."

¶ 30   After setting forth this evidence, the court found that the bottles were removed from the premises while the defendants were storing their equipment on the property. The court further found the value of the bottles to be $8 per case for a total of $1920.

¶ 31   Finally, the court addressed the plaintiff's claim for the cost of cleanup. The plaintiff offered into evidence a bid from a company called Sure Clean, Inc., to clean up the premises for $27,226. The court noted that the bid was dated November 2020. The court found that additional evidence showed that the defendants removed much of their lumber from the premises after that time and concluded that the reasonable cost for cleaning the remaining lumber was $6000. Accordingly, the court entered judgment in favor of the plaintiff for a total of $21,720 ($13,800 for lost mesne profits plus $1920 for the missing bottles plus $6000 for the remaining cost of cleanup).

¶ 32   The defendants filed a motion to reconsider, which the court denied after a hearing on February 9, 2023. The defendants subsequently filed this timely *pro se* appeal.[5]

¶ 33   After filing their notice of appeal, the defendants filed a proposed bystander's report. The plaintiff then filed its own proposed bystander's report. The court granted the parties a continuance to allow them to attempt to reach an agreement on a bystander's report. The defendants filed another proposed bystander's report in June 2023 along with a motion asking the court to certify it. However, there is no indication in the record that the parties ever came to an agreement. In addition, the trial court has not certified any of the proposed bystander's reports, and the retirement of the trial judge who presided over the hearings in this case complicates any further attempts at obtaining the court's certification. The matter has proceeded through briefing before this court

---

[5]We note that the notice of appeal was filed on March 13, 2023, which was 32 days after the court entered its final order on February 9, 2023. However, March 11, which was 30 days after entry of the judgment, fell on a Saturday. The notice of appeal filed on the next business day was therefore timely. See *Galaviz v. Mietus Restoration, Inc.*, 2023 IL App (1st) 220514, ¶ 25 (citing 5 ILCS 70/1.11 (West 2020)).

without the question of the bystander's report being resolved. The plaintiff cited its own proposed bystander's report in its brief, while the defendants described what occurred at various hearings without providing any citation to the record. After briefing was complete, the defendants filed a motion to strike portions of the plaintiff's brief that cite to its proposed bystander's report. We will address that motion and the status of the bystander's reports in our analysis.

¶ 34                                    II. ANALYSIS

¶ 35    The defendants argue that the court erred and abused its discretion by (1) entering findings of default against three of the defendants after erroneously finding that their motion to dismiss did not constitute an appearance in the case; (2) rendering "a biased opinion on mesne profits" and basing its calculations on information selected arbitrarily; (3) awarding damages for the missing bottles which, according to the defendants, were not owned by the plaintiff and "were proven not to be missing"; and (4) awarding damages to the plaintiff for the cost of cleanup when the plaintiff no longer owned the property and admitted it would not be incurring this cost. We reject all but the last of these contentions.

¶ 36              A. Bystander's Reports and the Plaintiff's Motion to Strike

¶ 37    Before considering the merits of the defendants' contentions, we must address the status of the parties' proposed bystander's reports and the defendants' motion to strike portions of the plaintiff's brief. As we discussed earlier, the trial court granted the parties a continuance to allow them to agree upon a bystander's report. However, they apparently never reached such an agreement, and the trial court did not certify any of the proposed bystander's reports the parties submitted. Illinois Supreme Court Rule 323(c), which governs the preparation of bystander's reports, provides that absent a stipulation by the parties, only a bystander's report that is certified by the trial court "shall be included in the record on appeal." Ill. S. Ct. R. 323(c) (eff. July 1, 2017).

12

Because the record before us contains neither a stipulation by the parties nor a certification by the trial court, the proposed bystander's reports appearing in the record are not properly before us.

¶ 38    Two months after the plaintiff filed its brief in this matter, the defendants filed a motion to strike the portions of the plaintiff's brief that cite to its own proposed bystander's report. Because that proposed bystander's report is not properly a part of the record on appeal (see Ill. S. Ct. R. 323(c) (eff. July 1, 2017)), we now grant that motion.

¶ 39    Before turning our attention to the merits of this appeal, we note that the parties introduced numerous exhibits into evidence, which *are* properly before us, and we find that we can resolve the questions before us based on those exhibits, the court's express findings of fact, and the applicable law. We will refer to the contents of the proposed bystander's reports only as necessary to provide context, but we will ground our decision in those portions of the record that are properly before us. With that in mind, we turn now to the defendants' arguments.

¶ 40                              B. Default Ejectment Order

¶ 41    We will first address the defendants' contention that the court abused its discretion by entering a default ejectment order against Joy, Kenneth, and Patricia. They argue that the court erroneously failed to accept the motion to dismiss signed by all four defendants as an appearance by Joy, Kenneth, and Patricia as well as by Brian. They further contend that, had the court not entered findings of default against these defendants, it would have granted the motion to dismiss because not all defendants met the criteria for ejectment. We reject these contentions.

¶ 42    We review the court's decision to enter a default order for an abuse of discretion or a denial of substantial justice. *CitiMortgage, Inc. v. Moran*, 2014 IL App (1st) 132430, ¶ 22. However, the question of whether the defendants' motion to dismiss constituted a timely appearance is a question of law; it is therefore subject to *de novo* review. See *Illinois State Toll Highway Authority v. South*

13

*Barrington Office Center*, 2016 IL App (1st) 150960, ¶ 32. Applying that standard, we answer the question in the affirmative.

¶ 43    As the defendants correctly contend, filing a motion or answer generally constitutes an appearance under the Ejectment Act and under the applicable supreme court rules. See 735 ILCS 5/6-116 (West 2020); Ill. S. Ct. R. 181(b)(1) (eff. July 17, 2020). However, their argument overlooks the fact that a defendant's appearance must be timely. The summons in this case required the defendants to appear on August 3, 2020. Under Rule 181, when a summons requires an appearance on a specific date, the defendants may enter their appearance either by appearing in court in person on the date specified or by filing a motion, answer, or written appearance on or before that date. Ill. S. Ct. R. 181(b)(1) (eff. July 17, 2020). Here, the defendants filed their motion to dismiss on September 1, 2020, nearly a month after the date specified in the summons. Only Brian filed a written appearance before August 3. Although the court granted Brian's request for a continuance of the hearing scheduled for that date, the other defendants did not request, much less obtain, an extension of time to file their responsive pleadings or other appearances. Thus, the court correctly found that they had not appeared.

¶ 44    Pursuant to section 2-1301(d) of the Code of Civil Procedure, a court has the discretion to enter a default judgment "for want of an appearance, or for failure to plead." 735 ILCS 5/2-1301(d) (West 2022). Before entering a default judgment, the court may require the opposing party to provide proof of the allegations upon which relief is to be granted. *Id.* However, "a default judgment is a drastic remedy that should be used only as a last resort." *Godfrey Healthcare & Rehabilitation Center, LLC v. Toigo*, 2019 IL App (5th) 170473, ¶ 39. On appeal, we will reverse a court's decision to enter a default order only if it constituted an abuse of the court's discretion or resulted in a substantial denial of justice. *Moran*, 2014 IL App (1st) 132430, ¶ 22.

¶ 45    Trial courts also have the discretion to set aside any finding of default prior to entering a final judgment and to set aside "any final order or judgment" upon a motion filed within 30 days after the judgment. 735 ILCS 5/2-1301(e) (West 2022). This provision is to be liberally construed, and a party requesting that a court vacate a default judgment is not required to assert either a reasonable excuse for failing to assert a defense earlier or the existence of a meritorious defense. *Godfrey Healthcare*, 2019 IL App (5th) 170473, ¶ 39. We review a court's decision on a motion to vacate a default order for an abuse of discretion or a denial of substantial justice. *Moran*, 2014 IL App (1st) 132430, ¶ 23.

¶ 46    Here, the three defaulted defendants filed motions to vacate the default order, but they never set their motions for a hearing. On appeal, the defendants do not directly challenge the court's failure to rule on their motions to vacate. Instead, they assert that if the court had accepted their motion to dismiss as a valid appearance, it would have vacated the default order. As such, we will confine our discussion to the defendants' contention that the court abused its discretion in entering the default order.

¶ 47    Turning our attention to that question, we first note that there is some authority for the proposition that, in the exercise of its discretion, a court may properly decline to enter a default order where a defendant files an untimely appearance if the plaintiff waits until after the defendant has appeared to request a default. See, *e.g.*, *Bland v. Lowery*, 43 Ill. App. 3d 413, 419 (1976) (holding that the trial court did not abuse its discretion in denying a plaintiff's request to default defendants five months after the defendants filed their untimely motion to dismiss); *Watford v. Rowe*, 2021 IL App (5th) 190434-U, ¶¶ 28-29 (following *Bland* and finding no abuse of discretion where the trial court denied the plaintiff's motion for a default judgment which was filed 82 days after the defendant filed an untimely motion to dismiss); see also *Moran*, 2014 IL App (1st)

15

132430, ¶ 30 (noting that "*Bland* is instructive in that it recognizes the validity of the defendants' motion to dismiss that was filed after the time period prescribed for pleading"). That is what occurred in this case. The plaintiff requested a default order against Joy, Kenneth, and Patricia at the September 4, 2020, ejectment hearing, three days after they entered their untimely appearance by filing a motion to dismiss. However, it is important to emphasize that while *Bland* and *Watford* held that the trial courts in those cases did not abuse their discretion in denying requests for default orders under the circumstances, neither decision addressed the question before us—whether a court abuses its discretion if it does enter a default order under similar circumstances. On that question, we find guidance in the First District's decision in *Moran*.

¶ 48 Like this case—and unlike *Bland* or *Watford*—*Moran* involved a question of whether the trial court abused its discretion in granting a motion for a default order after the defendant filed an untimely appearance and motion to dismiss. *Moran*, 2014 IL App (1st) 132430, ¶ 30. There, the plaintiff filed two motions for a default order against multiple defendants for their failure to appear. *Id.* ¶¶ 6-7. Following the second of these motions, the trial court granted one of the defendants, Moran, leave to file his appearance in the matter by a specified date. *Id.* ¶ 7. Moran filed his appearance two days after the deadline without leave of the court, and he filed a motion to dismiss two days later, which he did not set for a hearing. *Id.* ¶¶ 7-8.

¶ 49 Several months later, the plaintiff filed a motion to set Moran's motion to dismiss for a hearing. The plaintiff pointed to a local Cook County court rule that placed the burden of setting a motion for hearing on the party that filed the motion. *Id.* ¶ 9. The rule required motions to be set for hearing within 90 days. The plaintiff argued that, pursuant to the local rule, the court could deny Moran's motion on the basis of his delay alone. *Id.* Instead of ruling on the motion to dismiss, the trial court entered a default order against Moran. *Id.* ¶ 10.

16

¶ 50    On appeal, Moran argued that, under *Bland*, the trial court did not have discretion to enter a default order while his motion to dismiss was pending. *Id.* ¶ 28. The appellate court rejected this contention, finding *Bland* distinguishable because, "in *Bland*, the trial court considered and granted the defendants' motion to dismiss." *Id.* The court explained, however, that the *Bland* holding "recognize[d] the validity" of an untimely filed motion. *Id.* ¶ 30. The court also noted that Moran's failure to set his motion for a hearing did not preclude the court from ruling on it. *Id.* ¶ 35. The court therefore went on to consider whether to reverse the default order. *Id.* ¶ 32. The court explained that this required it to "evaluate the merits of Moran's motion to dismiss" because it would only reverse the default order if it found that the trial court should have granted the motion to dismiss. *Id.* After concluding that Moran's motion to dismiss lacked merit (*id.* ¶ 41), the appellate court held that the trial court acted within its discretion in entering a default order against him (*id.* ¶ 56).

¶ 51    Although not explicitly stated by the *Moran* court, entering a default order with an untimely motion to dismiss pending would be far more likely to lead to a substantial denial of justice if the motion has merit. See *id.* ¶ 22. Nevertheless, we do not believe that the entry of a default order can *never* constitute an abuse of discretion or result in substantial injustice unless a pending motion to dismiss has merit. Here, however, the defendants' only arguments on appeal are (1) that the court erroneously found that Joy, Kenneth, and Patricia failed to plead or appear—an argument we have already rejected; and (2) that if the court had not entered the default, it would have granted the motion to dismiss as to Brian and Joy because, according to the defendants, they did not meet the requirements for ejectment. Because these are the only arguments they raise, they have forfeited consideration of any other claims on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

17

¶ 52   We find no merit to the defendants' contention that the motion to dismiss would have been granted as to Brian and Joy had the court not entered a default order against Joy, Patricia, and Kenneth. We reach this conclusion for several reasons.

¶ 53   First, although the defendants never set their motion to dismiss for a hearing and the court accordingly never ruled on it, the court did ultimately consider and reject most of the issues raised in the motion to dismiss when it ruled on their subsequent motion to vacate the ejectment orders. The defendants do not challenge the merits of this ruling, and we believe it was sound.

¶ 54   Second, although Brian was not found to be in default, the court entered an ejectment order against him based on the evidence presented at the ejectment hearing. In addition, Joy appeared at numerous subsequent hearings at which she had ample opportunity to present evidence and arguments and ask the court to revisit its earlier order.

¶ 55   Third, the basis for the defendants' contention that Brian and Joy do not meet the requirements for ejectment is their allegation that Kenneth's lumber business was a sole proprietorship. We note that the default order did not prevent them from presenting evidence of this allegation in the form of a copy of a tax return, which appears in the record as an exhibit. Significantly, however, this does not necessarily absolve them of liability in an ejection action. A person "who orders, aids, directs, abets, or assists the commission of a trespass is liable for the resultant damages even if such an individual did not benefit from the trespass." *Miller v. Simon*, 100 Ill. App. 2d 6, 9 (1968). The defendants do not point to what additional evidence they might have presented had the court not entered the default order. We therefore find no merit to their claim that the court would have granted the motion to dismiss had it not entered the default order. We likewise find no abuse of discretion or substantial denial of justice.

18

¶ 56                            C. Damages Claims

¶ 57    The defendants' remaining claims concern the award of three types of damages. Where, as here, a court makes an award of damages after a bench trial, we review the court's judgment to determine whether it is against the manifest weight of the evidence. *King v. Find-a-Way Shipping, LLC*, 2020 IL App (1st) 191307, ¶ 28. We give deference to the trial court in its findings of fact because the trial judge had the opportunity "to observe the conduct and demeanor of the parties and witnesses." *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 54. A factual finding is against the manifest weight of the evidence only if it is arbitrary, unreasonable, or not based on the evidence, or if the opposite conclusion is clearly evident. *Id.* We will not overturn an award of damages unless we find either that the trial court ignored the evidence or that the measure of damages used was erroneous as a matter of law. *King*, 2020 IL App (1st) 191307, ¶ 28. If the record contains evidence to support the award, we will not find it to be against the manifest weight of the evidence. *Id.* With this in mind, we turn our attention to the defendants' specific claims.

¶ 58                            1. *Mesne Profits*

¶ 59    The defendants argue that the court erred in its award of mesne profits because the evidence it relied upon in determining the amount to award was arbitrary and did not establish the amount of damages with certainty. We disagree.

¶ 60    Under the Ejectment Act, a plaintiff entitled to an ejectment judgment "*shall* also be entitled to recover damages against the defendant for the rents and profits of the premises recovered." (Emphasis added.) 735 ILCS 5/6-130 (West 2022). Such damages are known as mesne profits, which are defined as "the value of the use and occupation of the land during the period of a defendant's wrongful possession." *Stein v. Green*, 6 Ill. 2d 234, 240 (1955). Put another way,

19

mesne profits are "the reasonable rental value which represents the worth of the use of the premises." *Miller*, 100 Ill. App. 2d at 10. As with any other element of damages, mesne profits may only be recovered with some evidence of the appropriate amount, which "must be proved with a reasonable degree of certainty." *Stein*, 6 Ill. 2d at 240.

¶ 61 The defendants argue that the plaintiff's evidence of the rental rates from Super A+ Storage did not meet this standard due to several differences between Super A+ Storage's facility and the plaintiff's premises. They point to the following differences: (1) unlike the Super A+ Storage facility, the plaintiff's property is not located near three major highways "from which to draw traffic"; (2) the plaintiff's property is not located near any body of water or recreational vehicle park where the types of items stored at Super A+ Storage might be used; and (3) the property lacks the security available at the Super A+ Storage facility. We are not persuaded.

¶ 62 As we discussed earlier, the court expressly considered the fact that the plaintiff's property was less secure than the Super A+ Storage facility. The court found that the value of using the property for storage purposes was thus lower than the value of using Super A+ Storage for that purpose, and it reduced the reasonable rental value in accordance with this finding. We do not find the other two differences highlighted by the defendants to be particularly relevant. The question is the value of the use of the property by the defendant. See *Miller*, 100 Ill. App. 2d at 10. Here, the defendants used the property to store their own lumber and equipment. Proximity to a lake or recreational vehicle park would not make the property more valuable for that purpose, nor would proximity to major highways from which to attract traffic. We do not find the court's reliance on the evidence submitted to be arbitrary, unreasonable, or contrary to the manifest weight of the evidence.

¶ 63    The defendants contend, however, that because the plaintiff's property had never been used for storage by anyone other than a lumber business, the court could not rely on evidence of storage rental rates for any other purpose. We disagree. The fact that defendants in an ejectment action use a property for purposes other than those uses intended by the property owner should not deprive the plaintiff of the ability to recover mesne profits. By statute, the plaintiff in an ejectment action is entitled to recover such damages so long as they are proven. See 735 ILCS 5/6-130 (West 2020).

¶ 64    The defendants next point to the evidence they submitted of a lawn mowing bid from Weston's Lawn Service stating that the cost of mowing the plaintiff's property would be $180 per month. In their statement of facts, the defendants assert that this "creates mesne profits of $1080 for use of the land for six mowing months." Although not clearly explained, their implicit argument seems to be that because the farm manager for the plaintiff's parent company previously allowed the defendants to store their equipment and lumber on the property in exchange for mowing the grass, the cost of paying a lawn service company to mow the property represents a reasonable rental value for this use. We reject this contention for two reasons.

¶ 65    First, the defendants forfeited this argument by failing to include it in the written closing argument they submitted to the trial court. In that argument, the defendants argued that the plaintiffs were not entitled to any mesne profits because they had not proven the measure of such damages. They did not argue that the Weston Lawn Services bid represented a more appropriate measure of damages than the evidence the plaintiff provided. Arguments not made to the trial court are forfeited on appeal. See *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 38. It is also worth noting that the trial court appears to have considered the bid as evidence in support of an argument that any damage award for mesne profits should be offset by the value

of lawn mowing services alleged to have been provided by the defendants. As discussed previously, the court addressed that question in its memorandum of decision.

¶ 66    Second, under the manifest-weight-of-the-evidence standard, we will not substitute our judgment for that of the trial court. *Archon Construction*, 2017 IL App (1st) 153409, ¶ 54. It was the role of the trial court, as finder of fact, to weigh conflicting evidence. *In re Estate of Lambrecht*, 375 Ill. App. 3d 865, 871 (2007). We will not overturn its factual findings merely because a different conclusion is possible; we will only reverse if the opposite conclusion is clearly evident. *Walker v. Ridgeview Construction Co.*, 316 Ill. App. 3d 592, 595 (2000). We have already concluded that the court's determination of mesne profits was supported by the evidence. While a different conclusion may have been possible, we do not believe the opposite conclusion was clearly evident. We therefore affirm the court's award of mesne profits.

¶ 67                                  2. *Missing Bottles*

¶ 68    The defendants next argue that the court erred in awarding damages for the missing bottles. They do not argue that the amount of damages was inaccurate or against the manifest weight of the evidence. They argue only that the court erred in awarding damages at all because the evidence showed that (1) the bottles were not missing and (2) they were not the plaintiff's property because they were sold to Russell and Christina along with the real estate. We disagree.

¶ 69    We first consider the court's finding that the bottles were missing. It is apparent from the court's recitation of the pertinent evidence that the court heard conflicting testimony on this question. Resolving conflicting evidence and assessing the credibility of witnesses are matters within the province of the trier of fact. *Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co.*, 306 Ill. App. 3d 115, 127 (1999). As we stated earlier, we may not substitute our

22

judgment for that of the trial court. This is particularly true "with respect to credibility determinations." *Harris Bank of Hinsdale v. County of Kendall*, 253 Ill. App. 3d 708, 715 (1993).

¶ 70    It is also worth noting that three affidavits offered into evidence by the defendants provide additional support for the court's determination. Kivlehen averred that after receiving a shipment of defective bottles in 2008, the defective bottles were moved to the "junk shed" along with empty bottles from the tasting room. Brian likewise stated in his affidavit that, while acting as the plaintiff's winery manager, he moved the defective wine bottles to the "junk shed" in approximately 2008. He further averred that he later learned that Kenneth moved the defective bottles back to the empty bottle storage room during the early stages of the cleanup. Kenneth gave an affidavit in which he averred that he moved the bottles from the "junk shed" to give him access lumber that he had been storing there.

¶ 71    As previously discussed, the plaintiff presented evidence that 240 cases of bottles that were in the winery building in 2011 were no longer there when Kennedy inspected the premises later. The statements in the affidavits demonstrate that the bottles at issue were not the same defective bottles that were moved to the "junk shed" because those bottles had been moved three years earlier. We find that the evidence in the record supports the court's finding that the bottles were missing.

¶ 72    The defendants also challenge the court's finding that the bottles were the property of the plaintiff. As the defendants acknowledge, the plaintiff offered into evidence a bill of sale transferring ownership of personal property, including the inventory, from White Owl Winery to the plaintiff's predecessor, Flat Rock Holdings. Although no similar bill of sale transferred specified items of personal property from the plaintiff to Russell and Christina, the contract for sale of the real estate, which was also offered into evidence, did contain boilerplate language

23

generally transferring the fixtures and personal property to Russell and Christina along with the real estate. The defendants contend that, because the sale was finalized before the court entered its final judgment in this case, the bottles were the property of Russell and Christina, not the plaintiff. We are not persuaded.

¶ 73 We first note that, although the plaintiff argues in response that the court correctly found that the bottles belonged to the plaintiff because they were removed before the sale was complete, the court stated in its order only that the bottles were not sold to Russell and Christina. However, we review the court's judgment, not its rationale. See *Brettman v. Virgil Cook & Son, Inc.*, IL App (2d) 190955, ¶ 40. Thus, we need not decide whether the boilerplate language in the contract for sale of the real estate included inventory such as the unused wine bottles in the sale. There was no evidence that the bottles were removed after the property was transferred to Russell and Christina. As such, the court correctly found that the bottles were the property of the plaintiff. We therefore uphold the award of damages for the missing bottles.

¶ 74                                    3. *Cost of Cleanup*

¶ 75 Finally, the defendants argue that the court erred in awarding damages for the cost of cleanup for three reasons. First, they assert that they completed the required cleanup of the premises to the court's satisfaction in March 2021. Second, they allege that the plaintiff acknowledged that it no longer had a claim for cleanup damages because it sold the property to Russell and Christina "as is." Third, the defendants allege that the court told them that the cleanup issue was moot and therefore did not allow them to present evidence to defend against the claim. They argue that this was unfair and deprived them of due process of law. We will consider these arguments in turn.

24

¶ 76    We will address the defendants' third claim first. There are two key flaws in the defendants' argument that the court unfairly refused to allow them to present evidence to defend against the plaintiff's claim for damages for the cost of cleaning up the property. First, they point to nothing in the record to support their assertion. Second, the record reveals that the defendants presented several photographs demonstrating that they had removed significant amounts of lumber and trash from the premises, and the court's memorandum of decision indicates that the trial judge considered and gave weight to this evidence. The record thus refutes the defendants' allegation that the court denied them the opportunity to present evidence in their defense. As such, we need not consider this argument further.

¶ 77    The defendants also argue that the court erred and abused its discretion in awarding damages for cleanup because the property had been cleaned to the court's satisfaction as of March 2021. As we explained earlier, the proper standard of review is not abuse of discretion but manifest weight of the evidence. See *King*, 2020 IL App (1st) 191307, ¶ 28. Here, although the defendants make a conclusory allegation that cleanup was completed to the court's satisfaction, the court expressly found only that a significant portion of the cleanup had been completed. The court reduced the damage award for the cost of cleanup accordingly. We do not believe this finding was against the manifest weight of the evidence, and aside from their conclusory allegation to the contrary, the defendants do not provide us with any basis upon which to make such a finding. We therefore reject this contention.

¶ 78    Finally, we consider the defendants' argument that the court erred in awarding cleanup damages because the plaintiff "dropped" that claim during trial. Although we reach this conclusion for a different reason than that advanced by the defendants, we agree that the court erred.

25

¶ 79    As the defendants correctly point out, the plaintiff filed a proposed order for damages with the court in August 2022 in which the plaintiff stated as follows: "Purgatory did acknowledge [at a hearing] that due to the resolution of the companion litigation case, 2020-CH-7, Purgatory no longer had a claim for the Sure Clean cleanup expenses of $27,226 as of November 6, 2022." According to the defendants, this was tantamount to "dropping" the plaintiff's claim for any and all damages associated with the need to clean up the property.

¶ 80    In response, the plaintiff argues that although its attorney "acknowledged that, because ownership of the property was transferred to Russell and Christina Neighbors in December 2021, before Sure Clean could come out to complete the clean, [the] plaintiff would not incur that particular cost," the plaintiff "never waived its argument to request damages for the delay or its own expenses regarding any cleanup efforts." The plaintiff further argues that it provided evidence of other expenses it incurred due to the defendants' delay in completing the ordered cleanup of the property. In particular, the plaintiff asserts that Amie Kennedy testified that she was required to make several visits to the property, each of which entailed a 120-mile round-trip drive, and that the plaintiff was required to purchase locks, "No Trespassing" signs, and other equipment.[6] The plaintiff argues that the defendants' "extreme delay" in complying with the previous orders to clean up the property "resonated with the Circuit Court" in its determination of the measure of damages for cleanup. We reject the plaintiff's contention.

¶ 81    The record clearly indicates that the court calculated damages for cleanup costs based on the Sure Clean bid, not on evidence of other expenses incurred due to the defendants' delay in

---

[6]In support of this contention, the plaintiff relies on its own proposed bystander's report. As we discussed earlier, however, that report is not properly before us because it was neither certified by the court nor stipulated to by both parties. See Ill. S. Ct. R. 323(c) (eff. July 1, 2017). Moreover, even if we were to consider the plaintiff's proposed bystander's report, the testimony described therein does not establish the *amount* of expense the plaintiff incurred.

26

cleaning up the premises. As we discussed earlier, the trial court expressly found that the reasonable cost of cleaning up the premises was $6000 after considering the Sure Clean bid and the extent to which the defendants had cleaned up the property. The court did not reference any other expenses the plaintiff might have incurred, and the record before us is devoid of any indication that the plaintiff ever asked the court to consider such expenses.

¶ 82    The purpose of a damage award in civil litigation is to make the plaintiff whole. *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 629 (2008). As such, a plaintiff must prove it incurred the requested damages. See *Stein*, 6 Ill. 2d at 240. Here, the plaintiff acknowledged at trial that it did not and would not incur the cost of hiring Sure Clean to clean up any portion of the premises. It also acknowledges as much on appeal. Because the court based its damage award for the cost of cleanup on evidence of a cost the plaintiff acknowledges it did not and will not incur, we find that the award is against the manifest weight of the evidence. We therefore reverse that portion of the court's judgment.

¶ 83                          III. CONCLUSION

¶ 84    For the foregoing reasons, we grant the defendants' motion to strike portions of the plaintiff's brief. We reverse the portion of the trial court's judgment awarding damages for cleanup of the premises. We affirm the judgment in all other respects.


¶ 85    Affirmed in part and reversed in part; motion to strike granted.